O'Brien, Appellant, v. State Farm Mutual Automobile Insurance Company and another, Respondents.

*October 2—October 30, 1962.*

For the appellant there was a brief and oral argument by *Charles Saggio* of Milwaukee.

For the respondents there was a brief by *Kivett & Kasdorf*, attorneys, and *Edward R. Cameron* and *John R. Henderson* of counsel, all of Milwaukee, and oral argument by *Mr. Cameron* and *Mr. Henderson.*

DIETERICH, J.   The record discloses the following facts: On December 10, 1959, at about 2:45 p. m., Maureen O'Brien had stopped her 1957 Chevrolet in traffic behind a long line of cars at an intersection with her foot on the brake.  While her car was in a stationary position it was struck from the rear by an automobile driven by the defendant Fred H. Yaeger.  Maureen O'Brien was thrown frontward and backward and felt immediate pain in her head, neck, and back.  She became hysterical and was driven in her own car to Milwaukee County Hospital by a police officer.  She was released at 7:30 that evening and returned home by cab.  The next day she began treatment by Dr. Brown.  She returned to work in the later part of January, but was not able to continue.  She returned to work permanently in March, 1960.

Trial was had to the court and jury.  The jury awarded damages for pain and suffering in the amount of $8,500.  The only issue on this appeal is whether the trial court

abused its discretion in reducing damages awarded by the jury for pain and suffering from $8,500 to $6,000. The rule requires that this court view the evidence in the light most favorable to the plaintiff. *Kincannon v. National Indemnity Co.* (1958), 5 Wis. (2d) 231, 92 N. W. (2d) 884.

The medical testimony in substance is as follows:

Dr. Wright, a specialist in radiology testified that he took X-ray films of plaintiff on the 14th day of December, 1959, at the request of Dr. Brown. The X rays indicated that the cervical spine (neck) curve was reversed from its normal anterior (front) curve. This condition was caused by a muscle spasm.

On cross-examination Dr. Wright testified that the reversal of curve in the cervical spine was slight to moderate, not severe, an angle of perhaps 10 degrees. This type of reverse curve was not an unusual finding with respect to a whiplash type of injury. The condition may or may not persist for more than a month after the injury. Plaintiff's entire spine was X-rayed but no more abnormalities were found.

On redirect examination, Dr. Wright testified that the reverse curve was about 10 degrees from a straight line, however, since the spine normally curves anteriorly 10 to 15 degrees, the total deflection from normal would be 20 to 25 degrees.

Dr. Brown's testimony is that he was called by either plaintiff or her grandmother on the evening of the accident and he recollected that he prescribed "something" over the phone. The next day he treated plaintiff at his office. He stated that plaintiff complained of pain in her back, neck, head, and other generalized aches and pains. On examination he found that the muscles in her back were tender and tight, and that she had limitations in the movements she could make with her neck. The tightness of the muscles is a sign of muscle spasm. The doctor observed that after the

X rays had been taken that plaintiff was hysterical and very nervous. It was his opinion that the accident caused the muscle strain or sprain of the back and aggravated plaintiff's nervous condition.

Plaintiff had been one of Dr. Brown's patients before the accident. After the accident he observed that she was much-more nervous, that she would cry and shake, so that eventually he suggested that plaintiff go to Sacred Heart Sanatorium for psychiatric care.

Dr. Brown further testified that plaintiff came regularly for treatment. She complained of pain in her back, shoulder, and neck, and also complained of headaches. It was Dr. Brown's recollection that plaintiff's headaches gradually subsided. He treated plaintiff with pain tablets, nerve tablets, and ethyl chloride which is sprayed on sore areas of the body to release spasm. Plaintiff was also treated with diathermy, and given muscle relaxants, tranquilizers, and sleeping capsules. In Dr. Brown's opinion plaintiff would continue to have pain in her back and neck for an indefinite time in the future and that her nervous condition would also continue for an indefinite time into the future.

On cross-examination, Dr. Brown testified that he referred plaintiff to Dr. Stone, an orthopedic surgeon on January 11, 1960, about a month after the accident. On the 20th of January, after receiving Dr. Stone's report, he advised plaintiff to return to her job. The muscle spasm found one day after the accident subsided in about one week, or perhaps two weeks. Tenderness continued to exist for a month or more, and that was the reason he sent plaintiff to see Dr. Stone. Plaintiff was unable to work in January, but did go back to work again on March 20, 1960, and was able to continue.

On redirect examination, Dr. Brown stated that his diagnosis of plaintiff's injuries was muscular and ligamentous whiplash injury of the neck, muscular and ligamentous whiplash injury of the thoracic and lumbar back, traumatic

shock, and nervous shock. Dr. Brown described the injury as a whiplash injury which tears the muscle and ligaments and in the healing process those tears are repaired by scar tissue which is permanent. Scar tissue interferes with circulation and in the healing process scar tissue contracts and pulls, and if it contracts on a nerve there will be pain. The injury plaintiff sustained was adequate to produce headaches.

Dr. Brown's testimony further discloses that he treated plaintiff for the last time on or about August 9, 1961, at which time she still complained about pain in her back and was still nervous.

Dr. Schaeffer, a specialist in neurology and psychiatry, testified he treated plaintiff from November 26, 1960, to May 13, 1961, and also saw her again on October 2, 1961. In order to treat her he investigated her background and found that she had been raised by her grandparents; that her parents had been divorced, and her father had left her mother when the patient was a baby. Her mother remarried twice, but the patient and her stepfather did not get along. She had always been somewhat nervous, but had not been bothered by crying spells or frequent headaches.

When Dr. Schaeffer first saw the plaintiff she complained of headaches which occurred about once a week and would last from a few hours to all day. Her head would shake when she was in a crowd, though this condition was improving; she had frequent crying spells, difficulty in sleeping, stiffness of the neck, felt tense when driving and another car approached; her hands were covered with perspiration, her nails were bitten, her voice was low and hesitant, and she eyed him suspiciously. Her pupils were dilated but reacted normally to light; she had no spasm of the neck or back muscles, but her reflexes were depressed in the upper extremities. There was slight diminished sensation to pinprick over the left upper back. Dr.

Schaeffer's diagnosis was that plaintiff had a marked degree of anxiety or anxiety reaction, a condition in which the patient reacts to situations with symptoms of fear and anxiety. It was his opinion that plaintiff's anxiety condition was directly caused by the accident which occurred on December 10, 1959. It was also Dr. Schaeffer's opinion that plaintiff would need treatment in the future; more specifically, several months of psychotherapy. After this treatment her condition should improve but much of the anxiety will remain indefinitely.

The last medical witness called by plaintiff was Dr. Stone, an orthopedic surgeon. His testimony is that he saw plaintiff for the first time on January 11, 1960, and for a second time on October 14, 1960. On January 11th, plaintiff complained of pain and stiffness in her neck, had difficulty in bending her head forward or backward or rotating her head from side to side without increasing the existing amount of pain. She also complained of pain in her back, she could not assume a forward bent position without increasing her pain, nor could she lift anything without causing additional pain. Her head moved freely and she could bend forward, backward, and to either side; however all these movements were accompanied with some tightness and pain. There was definite and absolute tenderness on pressure over the lower spine and where the spine meets the pelvis. A neurological examination did not reveal any pathological condition. X rays also failed to reveal any abnormalities. His diagnosis was that she had a typical whiplash injury in which muscles and ligaments of the neck and back are stretched and torn. These injuries heal and form tough, inelastic scar tissue. Her condition would improve with treatment. He also noted that her anxiety had been aggravated by the accident and her inability to work.

When Dr. Stone again saw plaintiff on October 14, 1960, she still had some pain in her neck, more severe on the left side than on the right. Occasionally her neck would become very stiff and she had difficulty moving her head. She showed definite improvement but was not well. She occasionally had violent sick headaches, her arms and legs would at times fall asleep, she had a tremor in her hand, at times she had an uncontrollable feeling that her head was shaking, and she still had some pain in her lower back—some feeling of weakness. On re-examination he noted that her motions in her neck were complete, but she exhibited some movements that are usually associated with an extremely tense, nervous type of person. Dr. Stone noticed that plaintiff hyperventilated, and that during the examination she cried; both symptoms of an anxious, tense individual.

Dr. Stone testified further that headaches are a common symptom following a whiplash injury. That when the patient's head is thrown backward and forward, it jars the contents of the skull resulting in a contrecoup, or concussion without a direct blow. It was his opinion that the patient's complaints of pain from various movements of the body resulted directly from the accident on December 10, 1959. The scar tissue that was left as a result of the muscle spasm will last indefinitely, but the pain resulting from such scar tissue will gradually decrease. The scarring leaves weakness in the muscle so that relatively minor injuries will cause another muscle spasm. Dr. Stone would not definitely say that plaintiff had a contrecoup concussion as a result of the whiplash injury on December 10, 1959.

On cross-examination, Dr. Stone testified that as a result of his examination of plaintiff on January 11, 1960, he felt that from the viewpoint of his specialty, orthopedic surgery, that plaintiff should return to work. As of his

examination of October 14, 1960, Dr. Stone stated that plaintiff had made a satisfactory recovery, not a complete recovery perhaps, but as good a recovery as she would make.

On redirect examination, Dr. Stone testified that plaintiff had a very low threshold of pain, that what to a person with an average threshold of pain would be a minor thing, would to plaintiff be a major thing.

The first medical witness called by the defense was Dr. Ansfield, an orthopedic surgeon. He examined plaintiff on February 1, 1960, at the request of State Farm Mutual Automobile Insurance Company. She enumerated the same complaints to him already testified to by the other medical witnesses, with the additional complaint that she had spots before her eyes. She did not complain of headaches as such, but of dizziness and pressure on the left side of the head. Movements of her neck were free, but accompanied with mild pain. Reflexes were normal except for the right knee which was sluggish. She had some tenderness in the middle of her back and where the spine joins the pelvis. Certain movements of the back were accompanied by pain or a pulling sensation, others were painless. Dr. Ansfield took X rays; all revealed a normal condition of the spine. It was his opinion that plaintiff may have suffered a sprain to the neck, that her head injury, if any, would not be permanent, and that she suffered a sprain to the lower back which would clear up. He did not feel she had any permanent injury and that many of her complaints were based on her nervous condition rather than any organic abnormality.

On cross-examination, Dr. Ansfield said that he did not believe plaintiff's dizziness resulted from an injury to the ear as a consequence of the whiplash injury.

Dr. Millen, a specialist in neurology and psychiatry, was the next witness called by the defense. He examined plaintiff on June 2, 1961, at the request of counsel for the de-

fendants. She complained of pain in the back and neck, headaches, nervousness, sweating, fearfulness when she was in an automobile, poor sleep, crying without much provocation, and other related symptoms. The background information he obtained from her was essentially the same as that obtained by Dr. Schaeffer. He conducted a neurological and physical examination and a psychiatric examination; the results of each were within normal limits. Her weight was 139 pounds, whereas before the accident she testified her weight had been only 105 pounds. She had worked regularly at Briggs & Stratton since March, 1960, except for two layoffs. From the evidence Dr. Millen concluded that the accident in which plaintiff was involved was relatively mild, as were her injuries. He did not consider her injuries disabling, especially in view of the fact that she was working, and was engaged to be married. It was also Dr. Millen's opinion that her condition would continue to improve.

The record and the memorandum opinion of the trial court indicate that the instant action was carefully considered by the trial court. The trial court does not state that the evidence did not support the findings of the jury, but only that the verdict was excessive. When a trial court determines that damages are excessive, and lowers the damages, or in the alternative grants a new trial, this court will reverse and order judgment entered on the verdict only if there was an abuse of discretion on the part of the trial court. *Puhl v. Milwaukee Automobile Ins. Co.* (1959), 8 Wis. (2d) 343, 99 N. W. (2d) 163.

"The general rule governing the trial judge or appellate court in determining whether damages are excessive is that since it is for the jury, and not for the court, to fix the amount of the damages, their verdict will not be set aside merely because it is large or because the reviewing court would have awarded less. The court relies upon the good sense of jurors to determine the amount of damages and

all that the court can do is to see that the jury approximates a fair estimate. Where the question is a close one, it should be resolved in favor of the jury verdict. *Makowski v. Ehlenbach* (1960), 11 Wis. (2d) 38, 103 N. W. (2d) 907." *Reddick v. Reddick* (1961), 15 Wis. (2d) 37, 43, 112 N. W. (2d) 131.

Plaintiff's injuries were clearly established by the evidence. The physical injury called "whiplash," its effects, the injury caused to the personality of the plaintiff, extreme nervousness, tension, fear, crying spells, perspiration, shaking of the head, were all adequately proved by the testimony of the medical witnesses.

After a careful review of all of the medical testimony and the record in its entirety, we determine that the finding for damages by the jury is supported by the evidence and that the verdict of the jury of $8,500 for pain and suffering be reinstated.

The trial court in determining motions after verdict reduced the verdict of the jury on the basis that it was excessive in the amount of $2,500, and modified the jury's verdict of $8,500 for pain and suffering, by inserting the amount of $6,000, and gave the plaintiff the option to elect to have a new trial on the issue of damages for pain and suffering.

Under the rule laid down in *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 102 N. W. (2d) 393, the decision of the trial court should have directed a new trial on the issue of damages unless the plaintiff elected to take judgment for the lesser amount.

The plaintiff refused to elect to take a new trial and the trial court entered judgment on January 8, 1962, on the verdict as modified. On February 20, 1962, in accordance with sec. 270.93, Stats.,[1] the defendants deposited with the

---

[1] Sec. 270.93. "Satisfaction of judgment. For the purpose of paying any money judgment, the debtor may deposit with the clerk of the court in which the judgment was entered the amount of his

clerk of the circuit court the amount of $8,330.94, in satisfaction of the judgment. Notice of the deposit for satisfaction of the judgment was served upon the plaintiff on March 1, 1962, by the sheriff of Milwaukee county.

On March 19, 1962, the plaintiff upon affidavit procured an order to show cause before the trial court why the clerk should not be prevented from satisfying the judgment entered in the action.

The plaintiff's attorney in support of the motion states in his affidavit that he has taken steps toward perfecting an appeal to the Wisconsin supreme court and will perfect such appeal on said matter, and that the affidavit is made for the purpose of securing an order to prevent the clerk of the circuit court from satisfying the judgment, that the plaintiff declines to accept the deposit made by the defendants and further declines to satisfy the judgment and that she declines to consider the payment made by defendants to the clerk as a satisfaction of the judgment.

The notice of appeal to this court was served upon the attorneys for the defendants on March 19, 1962.

The trial court in its order dated March 26, 1962, denied the plaintiff's motion.

It is apparent from this record that the plaintiff was of the opinion that the acceptance of any part of the money deposited by the defendants would jeopardize her appeal to this court. Under the circumstances in the instant action the plaintiff certainly was not entitled to the use of the money on deposit with the clerk of circuit court.

The judgment of the trial court is reversed, the satisfaction of the judgment vacated, and the verdict of the jury as to damages for pain and suffering reinstated. Plaintiff is entitled to interest from the time of the verdict.

liability thereon. . . . Ten days after giving the notice, the clerk shall, upon filing proof of such service, satisfy the judgment of record, unless the trial court shall otherwise order. . . ."

Because of the reinstatement of the verdict of the jury, other questions are moot.

*By the Court.*—Judgment reversed, with directions to reinstate the verdict of the jury and enter judgment thereon. Satisfaction of the judgment of the trial court modifying the jury verdict is vacated. Plaintiff to recover interest from the time of the verdict.