BOODRY, Appellant, v. BYRNE and others, Respondents.

*February 3—March 3, 1964.*

For the appellant there was a brief and oral argument by *Edward Rudolph* of Milwaukee.

For the respondents there was a brief by *Bender, Trump, Davidson & Godfrey,* attorneys, and *Kneeland A. Godfrey* of counsel, all of Milwaukee, and oral argument by *Kneeland A. Godfrey.*

CURRIE, C. J. The two issues presented by this appeal are:

(1) Did the circuit court abuse its discretion in finding excessive the jury's award of $15,280 for plaintiff's damages for personal injuries?

(2) If the foregoing question is answered in the negative, did the trial court abuse its discretion in fixing $6,000 as a reasonable amount to measure such damages?

### Excessiveness of Damages.

Where a trial court has reviewed the evidence and has found a jury verdict awarding damages to be excessive and

has fixed a reduced amount therefor, and has determined that there should be a new trial on damages unless the plaintiff exercises an option to take judgment on the reduced amount, this court will reverse only if we find an abuse of discretion on the part of the trial court. *Lucas v. State Farm Mut. Automobile Ins. Co.* (1962), 17 Wis. (2d) 568, 571, 117 N. W. (2d) 660, and cases cited therein.

In reviewing the evidence to determine whether the damages are excessive both the trial court and this court must view the evidence in the light most favorable to plaintiff. *Kincannon v. National Indemnity Co.* (1958), 5 Wis. (2d) 231, 233, 92 N. W. (2d) 884. The trial court, however, is not required to search out one or several isolated pieces of testimony, which standing alone might sustain the damages found by the jury, but rather must review all the evidence bearing on damages and then, viewed reasonably as a whole, consider the same in the light most favorable to the plaintiff. On appeal from a determination by the trial court that the found damages were excessive, this court will not find an abuse of discretion if there exists a reasonable basis for the trial court's determination after resolving any direct conflicts in the testimony in favor of plaintiff.

In the light of these principles we now turn to a review of the evidence bearing on plaintiff's damages for personal injuries. Immediately following the accident, which occurred on a Friday night, plaintiff was taken to Johnston Emergency Hospital. He was there examined by Dr. Claude who recorded that such examination disclosed a superficial laceration of the scalp and abrasions to the right shoulder, side, and hip. An antiseptic dressing was placed on the laceration. Plaintiff was advised to consult his family physician and sent home. At time of trial in January, 1963, Dr. Claude had no independent recollection of his examination of plaintiff, apart from the record made of it, and could not state whether

plaintiff had been required to disrobe in order to ascertain whether there were any contusions hidden by the clothing.

Plaintiff testified that after the accident he was groggy and unable to remember anything which transpired at the hospital. The next morning (Saturday) plaintiff's whole body ached, and he was unable to get out of bed alone until assisted by his wife and a neighbor. That morning he was examined by Dr. Mroczkowski, a general practitioner, at the latter's office. This physician recorded findings of such examination which were these: Tightness of the muscles of the left posterior neck so that the head was pulled over to one side; bruises and scratches to the right hip, the right lower back, the right mid-back; a small cut on the back of the right side of the head; scratches on the right side of the back of the neck; and a contusion to the right side of the stomach in the front abdomen area which was black and blue from bleeding from small blood vessels underneath the skin. Because of unsteadiness of gait, Dr. Mroczkowski also then diagnosed that plaintiff had sustained a concussion but apparently did not record this. Dr. Mroczkowski prescribed bed rest, cold packs for two days, application of heat to the bruised areas, and advised plaintiff to return to light work on Tuesday, November 18th.

Plaintiff returned home and stayed in bed until Monday when he appeared in court to give testimony in traffic court. The next morning (Tuesday) he returned to work at the plant of his employer, Unit Drop Forge. At the time the accident occurred he was twenty-nine years, eleven months of age, six feet, two inches tall, and weighed in excess of 200 pounds. When plaintiff was twelve years old he had sustained a badly fractured lower right arm in an automobile accident which left him with a shorter right arm, an ability to straighten the right arm only 85 percent of normal, and two stiff fingers on the right hand. At the time of the acci-

dent plaintiff was working as an assistant hammerman at Unit Drop Forge, having held this position for two and one-half years. The plant had a number of mechanical hammers which forged red-hot pieces of steel into various shapes. Plaintiff worked as one of a crew of either three or four men, depending on the size of the hammer, which men were paid on an incentive or piece-rate basis. The incentive rate was a crew rate, and each individual crew member received a certain fraction of the crew earnings as a group. Plaintiff testified that before the accident his earnings averaged between $3 and $3.25 per hour and that his average earnings were $125 per week. Because of inability resulting from his injuries, plaintiff was unable to perform his regular job during the first month after the accident. Instead he was given a job as inspector, which paid $95 per week, so that during that first month after the accident plaintiff had a wage loss of $30 per week. Thereafter plaintiff resumed his work as an assistant hammerman, although for a while he selected the smaller hammers to work on. However, although plaintiff testified that his work on the smaller hammers paid less than work on the larger hammers, he testified to no wage loss other than that sustained the first month while working as an inspector.

Dr. Mroczkowski saw plaintiff for the second time on Saturday, November 22, 1958. He then gave plaintiff an injection to hasten the absorption of blood in the bruised areas, and prescribed deep-heat treatments. Dr. Mroczkowski saw plaintiff frequently for a while after November 22, 1958. Plaintiff's chief complaint was pain in the left shoulder and left elbow. The shoulder trouble was diagnosed as left subdeltoid bursitis and the elbow trouble, as left lateral epicondylitis. These responded to treatment and cleared up. However, plaintiff continued to complain of pain in the left shoulder and on May 27, 1959, Dr. Mroczkowski referred

plaintiff to Dr. Collopy, an orthopedic specialist. While Dr. Collopy did not testify, his written report to Dr. Mroczkowski, dated June 12, 1959, was read into the record. This report stated: Plaintiff's back and right side had cleared up; there was no atrophy of the left shoulder; and that the left shoulder condition, which was diagnosed as tendinitis, had improved some. Dr. Collopy recommended a continuance of the treatment given by Dr. Mroczkowski, *i.e.,* deep-heat treatments, and cortisone injections into the shoulder. Dr. Mroczkowski followed these directions, and continued cortisone injections for a while.

Plaintiff's visits to Dr. Mroczkowski declined markedly in 1960, and in 1961 plaintiff saw Dr. Mroczkowski but twice, the dates being May 24th and November 9th. On May 24, 1961, plaintiff's primary complaint was pain in the left shoulder upon motion. Dr. Mroczkowski testified that whatever plaintiff consulted him about on November 9, 1961, had cleared up. Dr. Mroczkowski last saw plaintiff shortly before trial on December 24, 1962. For the first time, Dr. Mroczkowski then discovered some flattening of the anterior portion of the left deltoid muscle which, he testified, indicated atrophy. He also observed a clicking over the region of the biceps tendon. While some range of motion of the left arm was normal, if this arm was flexed and turned outward plaintiff experienced severe pain. When the arm was held in one particular position there was severe pain by pressing on the point of the long head biceps. Dr. Mroczkowski also found the right lower back tender and painful. He diagnosed the permanent residuals of the injury from the accident to consist of a left biceps tendinitis and a residual fibrositis of the right lower back in the lumbar region. Dr. Mroczkowski made no estimate of any percentage of disability. Plaintiff himself testified that at time of trial his back no longer bothered him so much, there was no longer constant pain, but that if he should happen to grab hold of something "just

right" and make a twisting movement pain would be there. Plaintiff also testified, with respect to the tendinitis, that if he would make an unusual twisting movement pain would be produced which would sometimes last three hours and sometimes two or three days.

Dr. Regan, an orthopedic surgeon, examined plaintiff on behalf of the defendants on January 18, 1960. He testified that he found no tendinitis or atrophy of the left shoulder and no evidence of a traumatic change to such area. He further stated that if atrophy is caused by an accident, it would occur very early and very rapidly because traumatic atrophy usually develops within six weeks of the date of the accident.

With respect to his employment with Unit Drop Forge subsequent to the accident, plaintiff testified as follows: In 1959 he tried out as a hammer operator when an opening in that job classification arose. After twenty-four days of trial, however, he had to give it up because his left shoulder bothered him. At that time this job then paid $3.40 per hour but at time of trial in January, 1963, the rate was about $3.60 to $3.70 an hour. Plaintiff returned to his job as a hammerman's assistant and continued in such capacity until August, 1961, when he transferred into the shear and saw department. While plaintiff testified that he told the superintendent he wanted the transfer because he could not "take" his old job any more, he actually benefited financially by this transfer. This is apparent because at time of trial plaintiff testified he was making about $4.30 per hour. The job in the shear and saw department consisted of setting a saw, placing billets in to be sawed, and then placing them in a box. Apparently plaintiff had no difficulty in performing this job from August, 1961, to date of trial.

In 1959 plaintiff became one of several union stewards in the plant. This position consumed about five or six hours per week of plaintiff's working time. In May, 1960, he was chosen chief steward and from then on spent about 70 per-

cent of his time in union business and the remainder of his time in production work. The employer paid him his "average earned rate," based on his earnings in production work, for the time during working hours when he performed his duties as steward. Plaintiff testified that this "earned rate per hour" which he was paid while performing union duties as steward included what he made at piecework. This obviously refers to the period when he was a hammer assistant and not when working in the shear and saw department, since it clearly appears that while working at production labor in the shear and saw department he was paid a straight hourly rate. On the state of this record plaintiff would still be earning approximately $4.30 per hour if he were to give up or lose the chief stewardship and devote full time to production work in the shear and saw department.

Damages for permanent partial disability are to be measured in terms of loss of earning capacity rather than in terms of loss of earnings. Nevertheless, the fact, that plaintiff is now able to make more money at production work for the same employer in the shear and saw department than he would have as either a hammer assistant or a hammer operator, has some materiality on the extent of his disability measured in terms of earning capacity.

With respect to pain and suffering, the evidence discloses that he was in considerable pain the first few days following the accident. The bursitis in the left shoulder and the epicondylitis in the left elbow were painful for several months. After the bursitis cleared up plaintiff's shoulder condition, which was diagnosed as tendinitis by Drs. Mroczkowski and Collopy, caused severe pain for some time. Dr. Mroczkowski's statement for services shows the administering of 17 physiotherapy treatments, the last being in January, 1959, and 12 injections into the shoulder, the last being on March 12, 1960. Plaintiff testified the heat treatments administered by his wife finally produced relief. Plaintiff also testified

that for a considerable period of time he had headaches. However, Dr. Mroczkowski did not testify to having made any record of plaintiff's complaining of headaches.

Plaintiff proved medical bills in the sum of $288. In addition he lost $30 per week in earnings during the first month following the accident when he performed lighter work as an inspector which would amount to approximately $130.

After a careful review of the evidence bearing on damages it is our considered judgment that the circuit court did not abuse its discretion in determining that the jury's award of $15,280 damages for plaintiff's personal injuries was excessive.

### Reasonableness of Amount of Damages Fixed by Trial Court in Granting Option.

One of the reasons advanced by plaintiff, as to why the amount of $6,000 fixed by the trial court as reasonable damages constituted an abuse of discretion, is that the trial court's memorandum opinion indicates that in fixing this amount that court was only considering the item of permanent injury, and thus such items as pain and suffering to date of trial and medical expenses incurred were ignored. While one sentence of the memorandum opinion taken out of context supports this contention, the reading of the opinion as a whole makes it clear that the trial court fixed $6,000 as the reasonable amount of plaintiff's damages for personal injuries, and that it was not confined solely to the permanent-injury aspect.

Where this court finds no abuse of discretion in a trial court's determining that the damages awarded by a jury are excessive, it is only in an unusual case that we will disturb the amount which the trial court has fixed as reasonable for the purpose of granting the plaintiff an option to accept judgment in that amount in lieu of a new trial on damages. It cannot be held that a certain amount alone represents rea-

sonable damages for a particular injury, or injuries, and that anything below or above that is unreasonable. In other words, reasonable damages fall anywhere between an unreasonable low and an unreasonable high.

In determining whether a trial court has abused its discretion, in fixing a certain sum as a reasonable amount of damages for the purpose of devising an option to comply with the rule of the *Powers Case*,[1] we apply the test of whether, if the trial court had been sitting as sole trier of the facts and had fixed damages in such amount, we would disturb such finding. Applying that test to the $6,000 figure arrived at by the trial court in this case, we would not disturb such finding. Therefore, we find no abuse of discretion in the trial court's determination that such sum is a reasonable amount to award as damages for plaintiff's injuries.

However, we deem it advisable to point out that $6,000 approaches the bottom of the range of reasonable damages which could be awarded plaintiff. If we had been sitting in the trial court's position we would have determined reasonable damages at a higher figure than $6,000. We pointed out in the *Powers Case* that the new rule therein enunciated was to replace the prior-existing rule of basing the option figure, in the option to be granted plaintiff, at the least amount for which a verdict might be rendered by an unprejudiced jury properly instructed. The reason advanced for this change was that it would reduce the number of instances in which the plaintiff would refuse to elect to exercise the option. Thus it would tend to reduce new trials. When, as in the instant case, a trial court, in framing the option, fixes the amount of reasonable damages near the bottom of the range of what is reasonable, the objective of this court in adopting the *Powers Case* rule is likely to be defeated.

*By the Court.*—The order appealed from is affirmed.

[1] *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 102 N. W. (2d) 393.

WILKIE, J. (*dissenting*). I agree with the majority in its affirmance of the lower court's determination that the jury verdict was excessive. I do not agree with the majority in its affirmance of the lower court's option afforded to the plaintiff under the *Powers* rule. In my opinion the amount of the option ($6,660) is not a reasonable sum considering all of the evidence for an award to the plaintiff for his damages. It is below the range of reasonably debatable amounts for a jury award under the facts of the case, viewed in the light most favorable to the plaintiff. I would raise the amount of the option, holding *first* that the trial court abused his discretion in setting the amount of the option, and *second* that $10,660 as the total amount of the award, subject to the apportionment of plaintiff's negligence, would be reasonable.

I realize that since the *Powers* rule was adopted our court has not raised the amount of an option as determined by the lower court. We have reinstated the jury verdict in several cases,[1] but I would not do so here since the jury award is excessive. If the purpose of the *Powers* rule is to be furthered, *i.e.*, elimination of unnecessary retrials,[2] I see no reason why this court should not, in an unusual but proper case such as this, raise the amount of the option to a reasonable figure where the amount set by the lower court is not within the range of reasonably debatable amounts and is, therefore, unreasonable.

[1] *Makowski v. Ehlenbach* (1960), 11 Wis. (2d) 38, 103 N. W. (2d) 907; *DeLong v. Sagstetter* (1962), 16 Wis. (2d) 390, 114 N. W. (2d) 788; *O'Brien v. State Farm Mut. Automobile Ins. Co.* (1962), 17 Wis. (2d) 551, 117 N. W. (2d) 654.

[2] "We have found the *Powers* rule to be a valuable tool, both in this court and in trial courts, to avoid unnecessary retrials." *Spleas v. Milwaukee & S. T. Corp.* (1963), 21 Wis. (2d) 635, 646, 124 N. W. (2d) 593.