DAVIS, Plaintiff and Appellant, v. GEIB and another, Defendants and Respondents.

GILLAN, Plaintiff, v. SAME, Defendants and Respondents: DAVIS, Impleaded Defendant and Appellant.

*September 6—October 4, 1966.*

For the appellant there was a brief by *Albert Bahcall* and *Kersten & McKinnon,* attorneys, and *George P. Kersten* of counsel, all of Milwaukee, and oral argument by *George P. Kersten.*

For the respondents there was a brief by *Giffin, Simarski, Goodrich & Brennan,* attorneys, and *E. J. Simarski* of counsel, all of Milwaukee, and oral argument by *E. J. Simarski.*

CURRIE, C. J.   The two issues presented on this appeal are:

(1) Was the causal negligence of plaintiff Davis as a matter of law equal to or greater than that of defendant Geib?

(2) Did the trial court abuse its discretion in finding excessive the jury's award of $25,000 for plaintiff's pain, suffering and disability?

### Comparative Negligence.

Not only is there a great conflict in the testimony with respect to the facts of the accident but two key witnesses, Groh and his passenger Gillan, gave testimony at the trial which is not reconcilable with statements made by them to the investigating police officer and with their signed statements given in October, 1961, to a representative of the insurance company which had insured the car driven by Groh. Because the credibility of the witnesses except where controlled by undisputed physical facts lies within

the province of the jury, our task on review is to deter-. mine whether there is credible evidence which would support the jury's finding that Geib was more negligent than Davis.

A version of the accident testified to Davis was this: At the time of accident Davis was twenty-two years old. He left Brown Deer in his 1958 Chevrolet at 11:15 p. m., passed one car going north, and pulled up behind the Oldsmobile driven in the same direction by Groh in the east traffic lane. Davis slowed down to the speed of the Oldsmobile and followed it for 100 to 200 yards, then signaled his intention to pass by blowing his horn a couple of times and blinking his headlights. Davis then turned into the center traffic lane. The front end of his car was about even with the rear fender or back bumper of the Groh car when he first saw the headlights of the Geib automobile approaching from the opposite direction from 500 to 1,000 feet distant. Davis estimated his own speed at 50 miles per hour. Davis assumed Geib was in the west traffic lane. It was not until the Geib car had traveled some 400 to 500 feet that Davis noticed that Geib was straddling the white broken line separating the west from the middle traffic lane. Davis estimated that one third the width of the Geib car projected into the middle lane. When the Geib car was 50 feet away, and Geib was still straddling the dividing line, Davis applied his brakes in an attempt to drop back and get back into the east lane. This attempt failed and the left front of the Geib car struck the left front of the Davis car. After being struck the Davis car veered to the right and hit the Groh car. The accident occurred on a Friday night. The next thing Davis remembered was waking up in a hospital and finding it was Sunday.

The testimony given by Geib was this: He was fifty years old and had been a truck driver for thirty-five years. On the night of October 6, 1961, he was driving his 1954 Chevrolet accompanied by his wife south in the

west traffic lane at a speed of 40 miles per hour. His headlights were on low beam. He saw the lights of two autos approaching from the south, one car being 200 to 300 feet behind the other. The rear car, which turned out to be the one driven by Davis, was weaving all over the highway. Geib estimated the speed of the Davis car at 70 to 80 miles per hour. Geib slowed down and pulled toward the west shoulder of the highway. In the meantime Davis pulled sharply out from behind the Groh car, struck it, and then careened over to the west side of the highway and its left rear struck the left front of the Geib car.

Groh and Gillan in their testimony at the trial corroborated Davis with respect to Geib straddling the dividing line between the west and center traffic lanes. They also testified that the first impact was between the Geib and Davis cars which is in direct conflict with verbal and written statements made by them shortly after the accident. Mrs. Geib did not testify but a portion of her adverse deposition taken before trial was read into the record. It is apparent from this that she did not definitely recall the position of the Geib car on the highway but thought the Geib car was far enough out on the roadway so that there was the width of a car distance between it and the west edge of the pavement.

On the other hand, Mr. and Mrs. Hirschel who were proceeding north and were about 400 feet south of the accident scene at the time of collision corroborated much of Geib's testimony. They testified to the high speed of Davis, his weaving down the highway from side to side and that the first impact was between the Davis and Groh vehicles.

After the accident Davis was lying unconscious on the pavement near his car. Several witnesses testified to him having regurgitated some liquid with a strong alcoholic odor. He testified that his drinking immediately

prior to the accident was limited to one or two bottles of beer.

Blumenberg, the police officer who arrived at the scene shortly after the accident, made a careful investigation and filed a detailed accident report. His diagram showed the position of the three involved vehicles after the accident to be as follows: The Geib car was facing southeasterly in the west traffic lane with its right rear slightly to the west of the west pavement edge; the Davis car was 46 feet 6 inches to the northeast facing almost westerly with the front end in the west traffic lane but most of the car in the center traffic lane; the Groh car was 64 feet to the northwest of the Davis car in the west traffic lane facing easterly. Before the Groh car came to rest in this position it had gone off the pavement on the east side of the road and its right side had crashed into a utility pole with such force as to crack the pole. It is undisputed that the left front of the Davis car was undamaged but the right front was damaged. Its left side commencing from the front door back to the rear was damaged. The principal damage to the Geib car was on the left side from the front back to the center post. The left rear fender of the Groh car was damaged and also its right side. There were no skid marks or other marks on the highway which would indicate the points of impact of the three vehicles. There was no debris on the west shoulder but debris was scattered across the paved roadway.

The physical damage to the vehicles clearly established that the right front of the Davis car collided with the left rear of the Groh car while it was the left front of the Geib car and the center and rear left portion of the Davis car that came in contact. The damage to the right side of the Groh car was the result of the collision afterward with the utility pole. While the damage to the vehicles and their position afterward are more consistent with the hypothesis that the first impact occurred be-

tween the Davis and Groh cars, this physical evidence is certainly not conclusive on this issue so as to render incredible the testimony of Davis, Groh and Gillan.

Sec. 346.13, Stats., is entitled, **"Driving on roadways laned for traffic."** Sub. (2) of this statute provides:

"Upon a 2-way roadway which is divided into 3 lanes the operator of a vehicle shall not drive in the center lane *except* when overtaking and passing another vehicle *where the roadway is clearly visible and such center lane is clear of traffic within a safe distance*, or in preparation for a left turn, or where such center lane is at the time allocated exclusively to traffic moving in the direction the vehicle is proceeding and is marked or posted to give notice of such allocation." (Italics supplied.)

The jury, by its finding of causal negligence on the part of Geib, necessarily must have found that his car was straddling the line marking the west and middle traffic lanes. Such act on Geib's part would be a violation of sub. (2) of sec. 346.13, Stats., because he was not overtaking or passing another vehicle. Davis also violated this statute when he attempted to pass the Groh car because with the Geib car occupying part of the center lane, such center lane was not "clear of traffic within a safe distance." The fact that Davis did not at first perceive the position of the Geib car is immaterial on the issue of his violating the statute.

The basis upon which the learned trial court found Geib and Davis each 50 percent negligent is set forth in its memorandum decision on motions after verdict as follows:

"It is proper for the court to hold as a matter of law that if two drivers violate the same substantial rules of the road under similar conditions, and such conduct is causal, then they may be considered as equally negligent. This appears to be appropriate in the case at bar, and the court will set aside that portion of the verdict pertaining to comparative negligence and hold that as a matter of law Mr. Davis was equally negligent as Mr. Geib."

While under the verdict it is apparent that the jury found both Geib and Davis guilty of violating sub. (2) of sec. 346.13, Stats., it does not necessarily follow that each is equally negligent as a matter of law. We deem our holding in *Evjen v. Packer City Transit Line* [1] is controlling on this issue. In that case two truck drivers, whose vehicles collided head on, were negligent in precisely the same respects. This court rejected the argument that this required that each be found equally negligent as a matter of law and declared:

"While it may be more difficult to apportion the amount of negligence when it is of the same kind and quality, such negligence is not necessarily as a matter of law equal." [2]

A reasonable basis for the jury concluding that Geib was more negligent than Davis is that the presence of the Groh vehicle to Davis' immediate right prevented him from turning right to avoid a collision when Davis first realized that Geib was not going to pull out of the middle traffic lane. There was nothing to Geib's right to prevent him getting entirely into the west traffic lane or partially onto the west shoulder as he claims he did. Thus it was reasonable for the jury to conclude that Geib was the more negligent for not having taken the available means open to him, but not to Davis, to avoid the accident.

Therefore, we determine that it was error for the trial court to change the jury's apportionment of negligence.

### Excessiveness of Damages.

Because the judgment entered dismissed the complaint of plaintiff Davis, no option of a new trial was afforded Davis with respect to the change of the $25,000 damage

[1] (1960), 9 Wis. (2d) 153, 100 N. W. (2d) 580.

[2] Id. at page 163. See also *Strupp v. Farmers Mut. Automobile Ins. Co.* (1961), 14 Wis. (2d) 158, 164, 109 N. W. (2d) 660; *Grana v. Summerford* (1961), 12 Wis. (2d) 517, 522, 107 N. W. (2d) 463.

answer of the verdict to $15,000. However, the trial court's memorandum decision makes it clear that his determination that the damages awarded for pain, suffering and disability were excessive was based on the rule announced by this court in *Powers v. Allstate Ins. Co.*[3]

Since the trial court proceeded in accordance with *Powers,* the following passage from *Baumgarten v. Jones*[4] is applicable with respect to its ruling on damages:

" 'In reviewing the actions of the trial court as to damage verdicts, the rules are set forth in *Boodry v. Byrne* (1964), 22 Wis. (2d) 585, 588, 589, 126 N. W. (2d) 503, as follows:

" 'Where a trial court has reviewed the evidence and has found a jury verdict awarding damages to be excessive and has fixed a reduced amount therefor, and has determined that there should be a new trial on damages unless the plaintiff exercises an option to take judgment on the reduced amount, this court will reverse only if we find an abuse of discretion on the part of the trial court. *Lucas v. State Farm Mut. Automobile Ins. Co.* (1962), 17 Wis. (2d) 568, 571, 117 N. W. (2d) 660, and cases cited therein.

" 'In reviewing the evidence to determine whether the damages are excessive both the trial court and this court must view the evidence in the light most favorable to plaintiff. *Kincannon v. National Indemnity Co.* (1958), 5 Wis. (2d) 231, 233, 92 N. W. (2d) 884. The trial court, however, is not required to search out one or several isolated pieces of testimony, which standing alone might sustain the damages found by the jury, but rather must review all the evidence bearing on damages and then, viewed reasonably as a whole, consider the same in the light most favorable to the plaintiff. On appeal from a determination by the trial court that the found damages were excessive, this court will not find an abuse of discretion if there exists a reasonable basis for the trial court's determination after resolving any direct conflicts in the testimony in favor of plaintiff.' "[5]

---

[3] (1960), 10 Wis. (2d) 78, 102 N. W. (2d) 393.

[4] (1965), 26 Wis. (2d) 703, 133 N. W. (2d) 346.

[5] Id. at page 705.

As a result of the accident Davis sustained a linear skull fracture with no bone displacement, a brain concussion and the loss of four upper teeth and one lower tooth, a ruptured eardrum, multiple lacerations, a temporary paralysis of the right side of the face, and a temporary numbness of the right arm. The most severe of the lacerations was one to the upper lip which required fourteen stitches to suture. There also was one of lesser extent to the lower lip.

Davis remained unconscious from the time of the accident on a Friday night to the ensuing Sunday. He was immediately hospitalized and remained in the hospital for three weeks. When Dr. Kay, the attending physician, first saw him he was bleeding from the mouth, nose, and ears. He suffered considerable pain and nausea and also had a middle ear infection.

The principal treatment was bed rest. He was permitted out of bed for the first time on October 22d and was discharged from the hospital one week later. Afterward he made three calls to Dr. Kay's office on November 2d, 9th and 16th, and this ended Dr. Kay's treatment. Davis testified that the paralysis ended three or four months after the accident as did a weakness in his right arm.

Prior to the accident Davis had been engaged in operating a scraper on a road-building project but also had been a sawyer. On April 1, 1962, he went to work in a knitting mill. A month and a half later he returned to construction work and is now a sawyer in a sawmill. No evidence was presented that the injuries he received constrict or impair his ability to work at his present employment.

His permanent injuries consist of the scars to his lips, a whistling noise in his right ear, a slight hearing loss in the right ear, and the loss of the five teeth.

The evidence is meager as to how disfiguring the scars to the lips are. Dr. Mortonson, the dentist who

examined Davis, testified, "Well, when I first saw the patient—I have seen—he resembled what we call a harelip." This is the only reference to "harelip" in the record. Dr. Mortonson also testified that there was an indentation to the contour of the upper lip due to loss of the teeth. This dentist advised a removable denture to replace the four missing upper teeth and a smaller one for the one missing tooth below. He further testified that the upper removable denture was necessary to give Davis "all the esthetic requirements and to bring his upper lip back into shape and to restore his mouth to form and function." Whether this latter testimony had any relation to remedying the appearance of the scar to the upper lip is uncertain. In any event the trial judge saw the scars and we must assume that he took them into full consideration in making his finding that the $25,000 damage figure was excessive.

The brief submitted in behalf of Davis claims Davis sustained "destruction of substantial portion of the upper jaw and surrounding tissue." This is grounded solely on Dr. Mortonson's testimony that "naturally when teeth are removed, there is quite a lot of bone lost, and surrounding tissue as well." The reasonable inference from this testimony is that whenever teeth are forcibly removed there is some loss of bone and surrounding tissue, and that there was nothing unusual in this respect in Davis' case.

Dr. Hara, an ear, nose, and throat specialist, testified as a witness for Davis. He described the hearing loss in the right ear in these words:

"He has what we call a combined type of hearing loss. This implies that part of it is due to injury of the nerve of hearing and partly due to scar tissue. . . .
"This hearing loss is at a level which is not considered normal. However, it is adequate for conversational purposes."

This testimony is not controverted and makes it abundantly clear that the hearing loss is slight.

Our review of the evidence in the record bearing on damages causes us to conclude that there was no abuse of discretion on the part of the trial court finding the $25,000 award excessive. No contention is advanced that the $15,000 figure found by the court does not represent a reasonable sum for pain, suffering and disability.

*By the Court.*—Judgments reversed. Cause remanded in Case No. 103 (the Davis action) with instructions to reinstate the jury's answer to the comparative negligence question of the verdict and to grant a new trial limited to damages unless plaintiff, within thirty days after the date of the order for new trial, elects to accept judgment for 72½ percent of the found damages after reducing the award for pain, suffering and disability to $15,000. Cause remanded in Case No. 104 (the Gillan action) for further proceedings consistent with this opinion. Appellant, in taxing costs on this appeal shall be limited to taxing printing costs for two thirds of the number of pages contained in his brief and appendix.