McCleary, Plaintiff in error, v. State, Defendant in error.

*No. State 78. Argued October 9, 1970.—Decided January 5, 1971.*
(Also reported in 182 N. W. 2d 512.)

264

For the plaintiff in error there was a brief by *Shellow & Shellow* and *Robert H. Friebert,* all of Milwaukee, and oral argument by *Mr. Friebert.*

For the defendant in error the cause was argued by *Lee Edward Wells,* assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren,* attorney general, and *E. Michael McCann,* district attorney.

HEFFERNAN, J. There is no serious contention that McCleary should necessarily have been placed on probation. It is apparent that, under the facts and circumstances of the case, the trial judge could properly impose some period of incarceration. The objection is to the excessiveness of the sentence. Counsel on appeal contends that, by the imposition of this sentence, defendant McCleary has been denied equal protection of the laws, as his sentence is disproportionate to those imposed on

other check forgers. He also contends that the imposition of so lengthy a sentence constitutes cruel and inhuman treatment, violative of the United States Constitution. We see no merit in either of these contentions.

The argument that defendant has been denied equal protection of the laws is based upon the fact that Gregory James Heydak, who gave the defendant the check on which he forged the name of Kopatich, was given a sentence of five years probation by Judge HERBERT J. STEFFES after pleading guilty to seven counts of forgery and one count of armed robbery.

Defendant contends that for Judge O'CONNELL to sentence him to nine and one-half years (including the six months already served) on a first offense on the single count of the nonviolent crime of forgery, merely because of disputed statements made by the probation officer in regard to the defendant's political philosophy, defies explanation and, when compared to Heydak's sentence, constitutes a denial of equal protection of the laws.

We agree that, on the face of things, the disparity is great; but we have frequently stated that the mere disparity of sentences does not establish a denial of equal protection of laws. It is not the philosophy of modern criminal law that the punishment fit the crime alone and that for every violation of a particular statute there be an identical sanction. In light of the function of the law to deter similar acts by the defendant and others and to rehabilitate the individual defendant, it is essential that a sentencing court consider the nature of the particular crime, *i.e.,* the degree of culpability—distinguishable from the bare-bones legal elements of it— and the personality of the criminal. The interests of both society and the individual must be weighed in each sentencing process. Clearly, the use of such an empirical guide will properly result in wide deviations from one

sentence imposition to another. Hence, the mere fact of disparity in the sentences received by persons committing similar crimes does not establish denial of equal protection. *Price v. State* (1967), 37 Wis. 2d 117, 154 N. W. 2d 222; *Jung v. State* (1966), 32 Wis. 2d 541, 145 N. W. 2d 684.

There may well be abundant reasons why Heydak was placed on probation—reasons that are totally foreign to the considerations relevant in the sentencing of Mc-Cleary. The record in Heydak is not before us, and we agree that the trial judge properly excluded the offer of proof to introduce the Heydak record into these proceedings, although there was testimony of Officer Mc-Hugh and of the defendant indicating that the Heydak and McCleary cases were related in that Heydak had given McCleary the Kopatich check blank. Had there been evidence of a closer relationship between the crimes of Heydak and McCleary, the Heydak sentencing might well have been relevant. *United States v. Wiley* (7th Cir. 1959), 267 Fed. 2d 453; *United States v. Wiley* (7th Cir. 1960), 278 Fed. 2d 500. There was nothing to show that Heydak was in any way associated with the same criminal act that was charged against Mc-Cleary. In the absence of a nexus between the crimes and defendants, the disparate sentences are totally irrelevant to this consideration.

This court can only speculate as to the reasons for Judge STEFFES placing Heydak on probation. In the instant case, Judge O'CONNELL indicated that he imposed a prison term rather than probation because he felt the defendant's conduct indicated a "nichey" attitude that he was above the law and that the defendant needed rehabilitative attention beyond that which could be afforded by probation. We are satisfied that Judge O'CON-NELL applied proper standards and reasoning in this determination.

The fact that Heydak received a sentence of probation is irrelevant. In any event the trial judge fully justified the rejection of probation in sentencing McCleary.

Nor can we accept the contention of the defendant that the term herein imposed constitutes "cruel and unusual punishment" in the constitutional sense. It was within the statutory powers of the trial judge to impose the sentence that he did impose. We have been offered no reasons why in the proper case it may not be just and reasonable to impose a sentence of not to exceed ten years.

The question as we view it is not whether the imposition of a nine-year-plus term was constitutionally infirm on the ground of denial of equal protection of the laws or as a cruel and unusual punishment, but simply whether it constituted an abuse of the trial judge's sentencing discretion.

We conclude that the sentence imposed, though within the statutory limits of sec. 943.38 (2), Stats., constituted an abuse of judicial discretion.

In *State v. Tuttle* (1963), 21 Wis. 2d 147, 151, 124 N. W. 2d 9, this court said it had the power to review sentences to determine whether an abuse of discretion had occurred. Therein, the court specifically relied upon sec. 251.09, Stats., saying:

"This court . . . has statutory power to reverse and to direct the entry of a proper judgment when it appears from the record that it is probable that justice has for any reason miscarried. We consider that we have the power to review sentences to determine whether an abuse of discretion clearly appears, and to remand for resentencing or to modify a sentence."

The court might also have referred to sec. 251.17, Stats., which provides that, on writ of error in a criminal case, this court, after reversing for defects, irregularities, or illegality after verdict may itself pronounce the prop-

er judgment or remit the record to the court below. Mueller, *Penology on Appeal: Appellate Review of Legal but Excessive Sentences*, 15 Vanderbilt Law Review (1962), 671; *Statute Law, Criminal Law—Power of Appellate Court to Modify Sentences on Appeal*, 9 Wisconsin Law Review (1934), 172.

It is clear that *Tuttle, supra*, which permits an appellate review for the abuse of sentencing discretion, is consonant with practices that are well nigh universal outside of the United States.[1] In fact, as is pointed out in the American Bar Association Standards Relating to Appellate Review of Sentences, page 2, no other country of the free world permits unrestricted sentencing power not subject to further judicial review. Thirteen of the 50 states have specific statutes spelling out sentence-review obligations. Seven states, including Wisconsin, have construed their appellate jurisdiction to impose the obligation to review judicial discretion in the imposition of sentence. The recent American Bar Association study committee concerned with this problem unanimously favored the appellate review of trial court sentences, although there were disagreements in regard to the right of an appellate court to increase, as well as decrease, the sentence imposed.

The American Bar Association *Approved Standards on Appellate Review of Sentences* states the objectives of such review are:

"(i) to correct the sentence which is excessive in length, having regard to the nature of the offense, the character of the offender, and the protection of the public interest;

"(ii) to facilitate the rehabilitation of the offender by affording him an opportunity to assert grievances he may have regarding his sentence;

---

[1] For an excellent discussion of the dire consequences to society if unfair and excessive sentences go uncorrected, *see* Menninger, *The Crime of Punishment.*

"(iii) to promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process; and

"(iv) to promote the development and application of criteria for sentencing which are both rational and just." (P. 7)

We conclude the sentences should be reviewed by this court bearing these objectives in mind.

The imposition of an excessive sentence and its review presents a judicial problem and not a problem for either the legislature or the executive. When the legislature grants sentencing power to the courts to impose sentences covering a range, as it did in the case of forgery—not to exceed ten years, it is apparent that it left it to the judicial discretion to determine where in that range the sentence should be selected. It is also apparent that the legislature concluded that all criminals convicted of a particular crime were not to be treated alike in respect to sentencing. Some were to be sentenced to probation, some were to be sentenced to short terms, and some to the maximum. Since it is the role of the courts to find rationality in legislative enactments where possible, we must conclude that the legislature intended that maximum sentences were to be reserved for a more aggravated breach of the statutes, and probation or lighter sentences were to be used in cases where the protection of society and the rehabilitation of the criminal did not require a maximum or near-maximum sentence. The legislature intended that individual criminals, though guilty of the same statutory offense, were not necessarily to be treated the same but were to be sentenced according to the needs of the particular case as determined by the criminals' degree of culpability and upon the mode of rehabilitation that appears to be of greatest efficacy. In *Neely v. State* (1970), 47 Wis. 2d 330, 334, fn. 8, 177 N. W. 2d 79, we recently quoted

with approval *Standards Relating to Sentencing Alternatives and Procedures,* American Bar Association Project on Minimum Standards for Criminal Justice, Approved Draft, 1968, page 14, sec. 2.2:

" 'The sentence imposed in each case should call for the minimum amount of custody or confinement which is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant.' "

It is thus apparent that the legislature vested a discretion in the sentencing judge, which must be exercised on a rational and explainable basis. It flies in the face of reason and logic, as well as the basic precepts of our American ideals, to conclude that the legislature vested unbridled authority in the judiciary when it so carefully spelled out the duties and obligations of the judges in all other aspects of criminal proceedings. Just because the legislature provides a range of ten years, it would be nonsense to conclude that, in a particular case, it would make no difference in terms of legislative intent whether the sentence was for one year or ten.

Since *Tuttle, supra,* this court will determine whether or not a trial judge has abused his sentencing discretion. The recent case of *Riley v. State* (1970), 47 Wis. 2d 801, 177 N. W. 2d 838, reviewed a number of post-*Tuttle* cases in which this court considered the trial judge's sentencing discretion. In discussing review of sentencing, we have frequently restated the *Tuttle* caveat (supra, page 150):

". . . that this question should be treated in terms of strong policy against interference with the discretion of the trial court in passing sentence . . . ."

Similar language runs through *Jung v. State* (1966), 32 Wis. 2d 541, 548, 145 N. W. 2d 684; *State v. Woodington* (1966), 31 Wis. 2d 151, 183b, 142 N. W. 2d 810,

143 N. W. 2d 753; *Price v. State* (1967), 37 Wis. 2d 117, 135, 154 N. W. 2d 222; *Nelson v. State* (1967), 35 Wis. 2d 797, 151 N. W. 2d 694; *Finger v. State* (1968), 40 Wis. 2d 103, 161 N. W. 2d 272; *Deja v. State* (1969), 43 Wis. 2d 488, 168 N. W. 2d 856; *State v. Harling* (1969), 44 Wis. 2d 266, 170 N. W. 2d 720; *Cheney v. State* (1969), 44 Wis. 2d 454, 171 N. W. 2d 339, 174 N. W. 2d 1.

It is thus clear that sentencing is a discretionary judicial act and is reviewable by this court in the same manner that all discretionary acts are to be reviewed.

In the first place, there must be evidence that discretion was in fact exercised. Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards. As we pointed out in *State v. Hutnik* (1968), 39 Wis. 2d 754, 764, 159 N. W. 2d 733, ". . . there should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth."

A similar rule is applicable in the exercise of judicial discretion in a civil case where damages are disputed in motions after verdict. We have held that we will not upset a post-verdict damage determination by a trial judge unless there is an abuse of discretion. In *Boodry v. Byrne* (1964), 22 Wis. 2d 585, 589, 126 N. W. 2d 503, we stated that, ". . . this court will not find an abuse of discretion if there exists a reasonable basis for the trial court's determination . . . ." In cases where the trial judge has failed to set forth his reasons, we examine the record *ab initio* to resolve the post-verdict damage questions. Unless there is evidence that the trial judge has undertaken a reasonable in-

quiry and examination of the facts as the basis of his decision, his decision will be disregarded by this court. Such a decision on its face shows an abuse of discretion for failure to exercise discretion.

The same rationale is applicable in reviewing a criminal sentence. We have frequently stated that we will remand for sentencing or modify the sentence only when an abuse of discretion clearly appears. By this we mean that this court should review and reconsider an allegedly excessive sentence whenever it appears that no discretion was exercised in its imposition or discretion was exercised without the underpinnings of an explained judicial reasoning process. Where the judicial sentencing discretion is exercised on the basis of clearly irrelevant or improper factors, an abuse of discretion also results.

In addition to the desirability of reviewing sentences to make sure that they are just, commensurate with the degree of guilt and the need for rehabilitation of the defendant, the American Bar Association Standards point out that sentence review will facilitate the rehabilitation of the offender by affording him an opportunity to assert a reasonable grievance he may have regarding his sentence. A by-product of a reasonable review of sentencing by an appellate court may well be the diminution of the appellate court's workload by reducing appeals on the merits.

In general an appeal from a sentence, at least where the trial judge has demonstrated his exercise of discretion in a written sentencing judgment, could be much more summarily handled than the average appeal on the merits. The American Bar Association committee takes notice of the fact, well known to this court, that many appeals ostensibly directed to the merits really result from sentencing dissatisfaction. James Bennett, former director of the federal prison system, has pointed out that,

". . . 40 to 50 percent of the time of the appeals court is required to review cases which would not be there had a reasonable sentence been pronounced." Bennett, *The Sentence—Its Relation to Crime and Rehabilitation,* S. Doc. No. 70, 88th Cong., 2d Sess., 307, 311 (1964), as quoted in American Bar *Standards Relating to Appellate Review of Sentencing,* Commentary, page 30, sec. 1.2 (h).

A realistic review of sentencing by a collegial court, where collective judgment may be exercised, would not only result in the correction of occasional abuses of power, but also would better give the appearance of justice.

"It is shocking, to say the least, that the United States is the only country in the free world where not only can a single man sentence without explaining why, but where there is no regular channel for review of his work." American Bar Association Project, Approved Draft, *Standards Relating to Appellate Review of Sentences,* Commentary, page 26, sec. 1.2 (d).

Perhaps most importantly, the review of sentences on a consistent and rational basis will inevitably lead to the development of criteria to be used by trial judges in the sentencing process. The judges of this state have shown great concern and interest in sentencing problems. No trial judge approaches the sentencing function with anything but the deepest sense of responsibility. However, appellate courts and this court have almost completely washed their hands of this problem, leaving it to the harassed and overworked trial judge to independently reach a rational sentencing decision, without the opportunity of having his judgment and discretion tested on a statewide basis, as it is in respect to all other judicial problems. Additionally, the trial bench has been deprived of the assistance that would be afforded by the appellate discussion and affirmance of well thought out sentencing

judgments of trial courts. The failure has been the appellate courts far more than that of the trial bench.

The American Bar Association Project, Approved Draft, *Standards Relating to Appellate Review of Sentences,* Commentary, supra, page 29, points out:

". . . sentence review can contribute to the development of sound sentencing principles and thus lead closer to the goal of approaching each defendant on the same basis. This in turn can be brought about in two ways: the requirement that the sentencing judge articulate the basis for his sentence will assist him in developing for himself a set of consistent principles on which to base his sentences; and the articulation in written opinions of the basis for a modification by an appellate court should lead to similar development on a more widely applicable scale. The following was written thirty years ago, and it is in most jurisdictions no less true today:

" 'The law gives the judge wide discretion in sentencing, but furnishes him no assistance in exercising that discretion. In performing their ordinary judicial functions, judges base their actions either on statutes or on prior judicial decisions and practices. Controversies involving innumerable difficult legal questions have in the course of centuries been appealed to the . . . appellate courts. . . . These courts have written opinions recorded in vast legal libraries. But in the difficult and important task of sentencing offenders, there are almost no precedents or standards to follow. Since determining what sentence to impose has nearly always been a matter of judicial discretion, few opinions have been written to explain sentences. The knowledge and wisdom of individual judges have thus died with them.'

"Warner & Cabot, Judges and Law Reform 159–60 (1936). Compare Glueck, Crime and Justice, pp. 128–29 (1936). Sentence review at least holds out the hope that the knowledge and wisdom of our experts will not die with them. It also holds out the hope that our system will be fairer and more equitable for that reason."

In all Anglo-American jurisprudence a principal obligation of the judge is to explain the reasons for his

actions. His decisions will not be understood by the people and cannot be reviewed by the appellate courts unless the reasons for decisions can be examined. It is thus apparent that requisite to a prima facie valid sentence is a statement by the trial judge detailing his reasons for selecting the particular sentence imposed.

An appellate court should not supplant the predilections of a trial judge with its own. Appellate judges should not substitute their preference for a sentence merely because, had they been in the trial judge's position, they would have meted out a different sentence. As in the examination of damages in a civil suit, all an appellate court can ask of a trial judge is that he state the facts on which he predicates his judgment, and that he give the reasons for his conclusion. If the facts are fairly inferable from the record, and the reasons indicate the consideration of legally relevant factors, the sentence should ordinarily be affirmed. If there is evidence that discretion was properly exercised, and the sentence imposed was the product of that discretion, the trial judge fully complies with the standard.

In any instance where the exercise of discretion has been demonstrated, this court follows a consistent and strong policy against interference with the discretion of the trial court in passing sentence. *Woodington, supra,* page 183b.

We adopt Standard 2.3 (c) of the American Bar Association *Standards Relating to Appellate Review of Sentences,* page 11, which provides:

"The sentencing judge should be required in every case to state his reasons for selecting the particular sentence imposed. Normally, this should be done for the record in the presence of the defendant at the time of sentence. In cases in which the sentencing judge deems it in the interest of the defendant not to state fully the reasons for the sentence in the presence of the defendant,

he should prepare such a statement for transmission to the reviewing court as a part of the record." [2]

The purpose of the sentencing statement is not only to aid in appellate review but also to facilitate the trial judge's rationale of his sentences. The requirement that the reasons for sentencing be stated will make it easier for trial judges to focus on relevant factors that lead to their conclusions. As Judge LUTHER YOUNGDAHL has said in *Remarks Opening the Sentencing Institute Program,* Denver, Colorado, 35 F. R. D. 387, 388 (1964), "a good sentence is one which can be reasonably explained."

The problem in the instant case arises because the trial judge failed to give his reasons why a lengthy, near-maximum sentence was appropriate. He very well and properly stated his reasons why probation was not appropriate, but gave no reason for the sentence he did impose. On its face, therefore, it appears that the sentence is the product of an abuse of discretion in that there was no delineation of any of the factors utilized by the trial judge in the exercise of discretion. As in *Hutnik, supra,* the failure to exercise discretion (discretion that is apparent from the record) when discretion is required, constitutes an abuse of discretion. We will not, however, set aside a sentence for that reason; rather, we are obliged to search the record to determine whether in the exercise of proper discretion the sentence imposed can be sustained. It is not only our duty not to interfere with the discretion of the trial judge, but it is, in addition, our duty to affirm the sentence on appeal if from the facts of record it is sustainable as a proper discretionary act.

We cannot from an examination of the record herein find facts to support the trial court's choice of sentence.

[2] The application of this section was heretofore discussed in *Denny v. State* (1970), 47 Wis. 2d 541, 546, 547, 178 N. W. 2d 38, in connection with resentencing after retrial.

McCleary was a first offender. His was not a crime of violence; it was solely against property. While the protection of property is vital to the viability of our free American society, it is important to note that McCleary stated he did not intend to place the financial onus on Kroger's, but rather that Kopatich, who he claimed owed him money, would be responsible for the check drawn on his account. This is, of course, no less of a crime; but when so viewed, it is apparent that the forging of the check was not an episode in a calculated vendetta against our society, but was rather an ill-conceived, immature act of one who sought retribution from an individual who he believed had defrauded him. However, the trial judge as a matter of credibility chose to disbelieve the defendant, and we are bound by that factual conclusion. But the disbelief of McCleary does not reasonably lead to the conclusion that the isolated act of forgery constituted a political-economic blow against the "system."

The presentence investigation was the work of a new and inexperienced caseworker, who had, according to the record, no prior experience or training in probation work. He was a philosophy major with two years of graduate work in the same subject. He attributed great import to books that the defendant had read at an early age. The probation officer stated in his report:

"The defendant's relationship with these relatives was good, but he became bored and took up reading as his favorite pastime. The defendant indicated that at a very early age he read such books as 'Das Kapital' and 'De Rerum Natura.' (It is obvious to the investigating officer that these and many other books were very influential to the defendant when he was at a ripe age. Such influence has made the defendant's interests and thoughts very stereotyped.) The defendant further stated that he had many mixed feelings about the society in which he lived. Although the defendant is ambivalent

in many respects, he attributes this feeling to the incompatability which exists between his 'idealogy' and the society in which he lives."

From this report the trial judge apparently drew the conclusion that the defendant had a "nichey" (sic) attitude and considered himself above the law. The observation was proper in respect to accepting the plea of guilty and in rejecting the probation alternative. The trial judge obviously felt, and said, that incarceration was necessary in view of the defendant's attitude, but he gave no reason why the ten-year sentence (later reduced to nine) was necessary.[3]

Reading the long disproved labyrinthine syllogistic "economic science" of Karl Marx is not a crime, though perusal of its turgid marshalling of preconceived prejudices may well be a form of punishment. It is ridiculous to assume, despite McCleary's ambivalence toward his society, that his check passing at Kroger's constituted a subversive political economic conspiracy to hasten the "withering away" of the state. The Marxist theory of "socialist inevitability" does not rely on check forgers to hasten the disintegration of the state.

The reading of *De Rerum Natura* and even the acceptance of some of its philosophy is not punishable as a crime. This writer would venture to guess that this eye-to-eye confrontation between a philosophy major lately turned probation officer and a convicted forger discussing *The Nature of Things* is unique in the annals of probation history. But *De Rerum Natura* is no mean literary achievement, and it is surprising that its reading

---

[3] At this point it would have been appropriate for the trial judge to make a statement indicating why a near-maximum sentence conformed to the sentencing standards of the American Bar Association, *supra, i.e.,* that the custody imposed was the minimum consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant.

should have been considered evidence of dark and dangerous designs against our society. Macaulay, in referring to *De Rerum Natura*, stated:

" 'In energy, perspicuity, variety of illustration, knowledge of life and manners, talent for description, sense of the beauty of the external world, and elevation and dignity of moral feeling, Lucretius has hardly ever an equal.' " Quoted in Lucretius, on *The Nature of Things*, page 9, Translation by L. L. Johnson, Centaur Press, Ltd., Fontwell Sussex, Great Britain.

Although the philosophy of Lucretius is by no means consistent with the Christian ethic, some commentators credit him with the rationale that effectively demolished the beliefs that supported the polydeistic theories of the Romans and made more readily acceptable Christian monotheism.

This writer, who as a prosecutor has read presentence reports on the state and federal level for fifteen years, is of the opinion that the philosopher-probation agent was overzealous in attempting to make his past educational experience pertinent to his new job.

True, the sentencing judge, as pointed out in the concurrence to *Riley v. State, supra,* has the opportunity, not afforded to this court, of observing the defendant's demeanor. This is reason for deferring to the trial court's discretion when there is evidence that it is exercised. It is not reason for foreclosing appellate review. In the instant case, only six pages of the record in the first sentencing were devoted to the testimony of McCleary. It may well be doubted that, on the basis of such brief appearance before the court, any observations could be made that would justify a ten-year sentence. If sentencing is to be based on such observations, they should be made a part of the record and subject to consideration as facts underlying the trial judge's exercise of discretion.

We are satisfied that in the instant case there is no evidence that judicial discretion was exercised in a manner that justifies a near-maximum sentence. Our review of the record, giving due deference to the trial judge, convinces us that this is a run-of-the-mine forgery case, less aggravated than many. None of the facts set forth in the presentence report or the entire record justifies a ten-year sentence. There is nothing in the record to show any tendency toward violence or a tendency to persist in criminal conduct. McCleary stated that he was now aware of the seriousness of his offense and had learned his lesson. While the trial judge is not obliged to place much credence in this eleventh hour remorse, McCleary's statement is entirely inconsistent with the assumption that his "nichey" attitude of defiance of the law would persist.

The sentence is therefore set aside on the ground that the trial judge failed to exercise any discretion justifying so lengthy a sentence. Under the facts of the record, it is excessive.

The attorney general argues that the future of this defendant as a free member of our society is not substantially foreclosed by the fact that he received a sentence of nine years. He correctly points out that an indeterminate sentence was imposed. Such a sentence is authorized by sec. 959.05, Stats. Sec. 959.05 (1) (b) provides that:

"The sentence shall have the effect of a sentence for the maximum term fixed by the court, subject to the power of actual release from confinement by parole by the state department of public welfare, or by pardon as provided by law."

Sec. 57.06, Stats., authorizes a parole of an inmate of the Wisconsin state prisons "when he has served the minimum term prescribed by statute for the offense

(which [minimum term] shall be one year unless a greater minimum is prescribed by the statute defining the crime). . . ."

Under these statutes, the attorney general points out that McCleary attained parole eligibility after one year's imprisonment. It is therefore argued that the actual period of incarceration likely to result from this sentence is not excessive even though it be conceded, *arguendo*, that actually serving a ten-year term would be excessive punishment for the crime of forgery under these circumstances. This, of course, is a nearly explicit admission of the excessiveness of the sentence, but the attorney general argues that the abuse of trial court discretion will be ameliorated by legislative grace exercised by the department of health and social services. Also implicit in this argument is the contention that the judiciary assumes no responsibility for sentences imposed. The assumption of the attorney general is that the parole board completely disregards the exercise of judicial discretion or the absence of it at sentencing and makes its own determination *ab initio* as the result of its studies of the prisoner. The argument is based on the premise that there is no relationship between the sentence imposed and the time actually served. No evidence has been submitted in support of this assertion, however, and it appears to run counter to the experiences of this court, which indicate there is a relationship between the length of sentence and the date of first granting parole. It should be pointed out that the records of the department of health and social services show that McCleary did make application at the time of original eligibility and parole was denied. Moreover, if the indeterminate sentence is of no consequence in determining the actual period of incarceration, then the much vaunted opportunity of the trial judge to observe the defendant and base his conclusions on the facts as he sees them in the

course of trial is a completely irrelevant exercise in futility. We doubt that even the most ardent opponents of sentence review would accept this thesis. It should be noted also that the date of mandatory release is directly related to the maximum sentence. Our experience in reviewing petitions of persons incarcerated at the state prison indicates that large numbers of prisoners do not attain their freedom until the date for mandatory release has arrived.

The indeterminate sentence serves a useful penological and rehabilitative purpose, and it vests considerable discretion in the hands of those who are best able to determine the progress toward rehabilitation that a prisoner makes during a term of incarceration. The fact that egregious errors of the judiciary can thus be partially corrected in no way absolves the court system from its duty to dispense justice fairly. Moreover, if in a proper case the judge, in the exercise of proper discretion, imposes a severe sentence which has the approval of the public, it is a fraud on the public if sentences thus imposed on dangerous criminals are completely disregarded by the probation department. We serve no public interest by perpetuating the canard of judicial sentencing if the sentence is in fact meaningless. We are satisfied that a sentence properly imposed in the exercise of judicial discretion is, and should be, considered highly relevant in the determination of parole by the department of health and social services.[4]

---

[4] The writer of this opinion sees great merit in a true indeterminate sentence, if it were made clear to the public that the actual term of incarceration is a matter of legislative prerogative to be exercised through the probation and parole agents. But as sentences are now imposed, the public is misled into thinking that a trial judge has safely isolated a dangerous criminal from society when, in fact, all he has done is to turn him over to "experts" for analysis and treatment, and possible early

As we have stated, our review of the record indicates that this is a mine-run forgery. Its only deviation from the usual first offense is the evidence of record that indicates the defendant considered himself to be above the laws designed to control relations between citizens and that, hence, a substantial period of close rehabilitative control appeared in order. For this reason the trial judge properly denied probation. Although the sentence imposed constituted an abuse of discretion in that no reasonable explanation was given for the near-maximum sentence, we are satisfied that a substantial term of imprisonment should nevertheless be imposed.

Numerous attempts have been made to formulate and codify guidelines for the exercise of the sentencing power. Among the better known efforts are the *Model Sentencing Act,* prepared by the Advisory Council of Judges of the National Council on Crime and Delinquency, and the *Model Penal Code,* prepared by the American Law Institute. Both of these proposed codes appear in the appendices to the American Bar Association *Standards Relating to Sentencing Alternatives and Procedures.* Each of these proposed codes distinguishes types of felonies.

In the *Model Sentencing Act,* McCleary's offense is of the type denominated as not dangerous or atrocious. Under the proposed recommendation of the *Model Sentencing Act,* a dangerous offender may be sentenced to as much as thirty years' imprisonment, but an ordinary felon, it is suggested, should receive a maximum of five years. A dangerous offender is one who is sentenced for a felony involving serious bodily harm and has a personality disorder indicating a propensity toward criminal

---

release. This may be good penology and good sociology, but it does not comport with fundamental honesty in dealing with the public—at least if we take seriously the attorney general's argument that the judicially imposed sentence is irrelevant.

activity. In general, the category of dangerous offender is reserved for those who have committed a crime which seriously endangers the safety of others.

The *Model Penal Code* also attempts to categorize felonies into first, second, and third degree. In general, the ordinary term for a third-degree offender, in which category McCleary's crime would fall, runs from a minimum of one year to a maximum of not to exceed five years. Extended terms are to be available if there is evidence that the defendant is a dangerous, mentally abnormal person whose extended incarceration (after a psychiatric examination) for the protection of the public.

The approved American Bar Association *Standards Relative to Sentencing Alternatives and Procedures,* page 13, sec. 2.1 (d), takes the position that the maximum term to be imposed for a crime not involving the physical safety of others should not ordinarily exceed five years.

We adopt none of these Standards relating to length of sentence, but we find it persuasive that the considered judgment of all these studies concludes that the ordinary offender ought not be sentenced to a term in excess of five years unless circumstances are present which trigger a proper exercise of judicial discretion to impose a greater sentence. None of these circumstances are apparent from the record in this case. In imposing the term of five years in this case, we do so in deference to the judgment of the trial judge and impose what we consider to be the maximum sentence that reasonably ought to be imposed in light of the facts revealed in the record and the trial judge's partial appraisal of these facts. We wish to make it absolutely clear, however, that a trial judge, in an aggravated case and in the exercise of proper discretion, could impose a maximum ten-year sentence in a forgery case and that such discretion would be sustained by this court.

We conclude that, for purposes of parole eligibility and service of the sentence now imposed, the term of imprisonment shall commence on the date of McCleary's original sentence, to wit, twelve o'clock noon on March 21, 1969.

*By the Court.*—The sentence heretofore imposed by the circuit court for Milwaukee county on September 2, 1969, is set aside and vacated. The defendant, Richard David McCleary, is hereby sentenced to the Wisconsin state prisons at hard labor for an indeterminate term of not more than five years, the term to commence at twelve o'clock noon on March 21, 1969.

HALLOWS, C. J. (*concurring*). I concur with much of what is said in the court's opinion, but I would go farther in justification of the result.

This is the second case to modify the sentence pronounced by a trial court since *State v. Tuttle* (1963), 21 Wis. 2d 147, 124 N. W. 2d 9, and *Jung v. State* (1966), 32 Wis. 2d 541, 145 N. W. 2d 684, which recognized the power of this court to review the propriety of a sentence. In both of these cases and in some subsequent cases, it was stated the court would only reverse or modify a sentence in a rare instance of abuse of discretion. Both *Tuttle* and *Jung* were decided before the American Bar Association's standards on sentencing were drafted and approved. In *Jung* we pointed out the then lack of standards or agreement in sentencing and stated at page 548 a study of the problem was then in progress by the American Bar Association.

In *Denny v. State* (1970), 47 Wis. 2d 541, 178 N. W. 2d 38, this court by its mandate reduced a sentence because the trial court was in error in resentencing the defendant to a greater sentence than he received at the first trial. *Denny* pointed out the importance, in resentencing, sentencing on a new trial, or modifying a sen-

tence, of the court having the transcript of the original sentencing and the need for the reasons for the sentence appearing in the record because we are being increasingly called upon to review criminal sentences. *Denny* states, at page 546, ". . . trial courts must now make a record of the concrete, identifiable, specific reasons for all resentencing, so this court can properly reconstruct what happened in reviewing the sentence." We also pointed out the necessity of including the presentence report when used by a trial judge and of requiring it to appear in the record, citing *Embry v. State* (1970), 46 Wis. 2d 151, 174 N. W. 2d 521, and the *Standards Relating to Appellate Review of Sentences,* American Bar Association Project on Minimum Standards for Criminal Justice, Approved Draft, 1968, page 42, sec. 2.3.

The lack of a complete record on sentencing should be error, not an abuse of discretion. In my view of the case before us, the reduced sentence is justified on the merits and not because the trial court failed to give reasons in the record why the lengthy sentence was imposed. The trial court did give its reasons briefly in one form or another but they are insufficient to justify the sentence when all facts appearing in the record are considered. The court's opinion views this case as within the rule that we only modify a sentence when it results from an abuse of discretion. This court should review sentencing as a matter of course as it does other legal issues. If the "abuse of discretion" test is to be used, then the concept of abuse should be liberalized or the error-concept adopted. *See* the dissent in *Riley v. State* (1970), 47 Wis. 2d 801, 809, 177 N. W. 2d 838.

What the majority calls an abuse of discretion may well be a constitutional error. An excessive sentence may be so greatly disproportioned to the offense charged as to constitute a violation of the constitutional guarantee against cruel and unusual punishment. *Weems v.*

*United States* (1910), 217 U. S. 349, 30 Sup. Ct. 544, 54 L. Ed. 793. In *Ralph v. Warden* (4th Cir. 1970), 438 Fed. 2d 786, the court, quoting from *Weems,* stated, "The court gave full effect to current concepts of proportionality, because the cruel and unusual punishment clause is 'progressive' and 'is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *See also: Trop v. Dulles* (1958), 356 U. S. 86, 101, 78 Sup. Ct. 590, 2 L. Ed. 2d 630, "The [eighth] amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

The trial court was in error in not considering the sentence given to Gregory James Heydak. In multibranch criminal courts, as in Milwaukee, it is important that the judges conducting criminal trials follow general standards to insure uniformity and equality in individualized sentences. There should be no tough judge or soft judge. Great disparity in substantially similar cases is one of the current injustices in our jurisprudence and the grounds of many complaints to this court. There is need for the establishment and unification of guidelines for all sentencing which should apply not only to a multibranch criminal court but also to all courts in the state. The objectives of criminal sanctions can be developed by trial judges becoming more concerned and cognizant of uniform standards of individualizing sentences; and like other legal solutions, standards can be developed by judicial appellate review and decision on the merits of sentences. It is no longer acceptable that a sentence within the maximum allowed by statute is not an abuse of discretion.

The present trend is toward uniform guidelines in criminal sentencing and procedure. Some of these have been set forth in three American Bar Association standards, *i.e., Standards Relating to Criminal Appeals;*

*Standards Relating to Sentencing, Alternatives and Procedures;* and *Standards Relating to Appellate Review of Sentencing.* This new concern of sentencing and the need for uniform guidelines have been the subject of many state institutes for judges on sentencing and is now an important and popular course in the National College of State Trial Judges. This concern also motivated this court to recognize jurisdiction in the trial court to reconsider a sentence after the defendant had been imprisoned. *Hayes v. State* (1970), 46 Wis. 2d 93, 175 N. W. 2d 625.

Although this court ought not to set aside a valid sentence because it is excessive and impose a new sentence to commence retroactively, such procedure was required in this case because the trial court did not follow the recommendations in *Hayes.* Rather than modify the original sentence, the trial court vacated it and imposed a new sentence which was not made retroactive.

ROBERT W. HANSEN, J. (*dissenting*). This case seems to involve three "R's"—reading, 'riting and repetition—with the third "R" the important one here.

What got the defendant into trouble with the law was not his reading. One need not subscribe *in toto* to the literary critiques in the majority opinion to agree that the reading interests of the defendant have no relevance to charge, conviction or sentence imposed. In fact, as a former mayor of New York City implied, checks are not forged by books.

What brought the defendant to court was the second "R"—'riting—in this case, writing a forged check. His plea of nolo contendere and a presentence investigation preceded the imposition of sentence.

However, on the matter of the sentence to be imposed, it is the third "R"—repetition, the predictability of reoccurrence—that became material, in fact, controlling.

In imposing the maximum sentence of ten years (subsequently reduced on motion to nine years), the trial court stated:

*"The Court:* I want to read into the record certain pertinent portions of the presentence report, on Page 1 under the heading 'Defendant's statement: The defendant disclosed that he had always taken pride in his ability to cash checks. . . . The defendant added that he didn't feel that he would be caught for this offense and that he had no respect for the authorities. . . . The defendant denied any feeling of guilt in this offense as he does not consider taking money from institutions "stealing" but "profit sharing." The defendant continued his statement by stating how superior he felt to most other people, including the law itself. . . .' "

As the probation officer stated in his "summary and recommendations," such statements go beyond establishing "that the defendant does not have the proper attitude or sense of responsibility needed in order to benefit from probation." They support the conclusion that "it appears to the law investigating officer that the defendant has no desire to change or conform to them [the laws of society]." The court was confronted and society threatened by the predictability of repetition—of the same type of offense by the same defendant.

It is a principal, public-protecting purpose of the whole process of the administration of criminal justice to make recidivism less likely. Whether this purpose can best be served by probation or incarceration depends upon the facts and factors in a particular case. The choice between supervision and isolation is a choice between tools to use in seeking to insure some insurance against repetition. The majority opinion concedes that the facts in the presentence report justified the trial court "in rejecting the probation alternative." The writer would agree that probation is not indicated for a convicted felon who states that he has no sense of guilt, no

remorse, and gives every indication that he does not intend to abide by the laws of society. However, the majority states that while the trial judge "obviously felt, and said, that incarceration was necessary in view of the defendant's attitude," he "gave no reason why the ten-year sentence (later reduced to nine) was necessary." No search is necessary for the reason. It is the same reason: what the majority terms "the defendant's attitude," and what the writer would term the "predictability of repetition." Future conduct as well as present attitude are involved. The length of, as well as the necessity for, incarceration are alike involved where it is made clear by a defendant that he intends to continue to act in defiance of the laws of the land. The defendant's express intention to live ungoverned by the law provides both reason and reasonableness to the sentence imposed. If, in fact, the majority felt that the trial judge here had imposed sentence "without explaining why," the appropriate remand would be for resentencing or completion of the record by stating such reasons.

Instead the majority reduces the nine-year sentence to five years. The four-year difference between the trial court and appellate court sentences does not affect eligibility to parole. The majority thinks it may, or at least should, affect the granting of parole. Here the defendant has applied for parole, and action on his application has been deferred, not denied. However, the majority points out that the maximum sentence is related to the date of mandatory release. Exactly so, and exactly why, given the defendant's attitude and intentions, early release without a wholehearted change as to attitude and intent was not in the public interest. The indeterminate sentence law is intended not only to justify earlier release where prospects for conforming to the laws are good, but to continue isolation from the community where such prospects are poor, or, as here, without a change of at-

titude, nonexistent. The majority gives weight to the defendant's statement, made at the time of his motion for reduction of sentence, that he had "learned his lesson," finding it "entirely inconsistent" with the assumption that defendant's defiance of the law would continue. It concedes that the trial court was not obliged to place much credence in "this eleventh hour remorse." Post-midnight repentance might be a more apt description, chronologically speaking. Actually, the trial court was required to give the statement no credence, and none it gave. To give it weight, even mention, on appeal is to substitute the judgment of a court that did not hear the statement for the evaluation of the court that did.

What is puzzling and disturbing in the majority opinion is the holding that "this is a mine-run forgery." Coupled with a detailed reference to a proposed Model Sentencing Act (presumably intended for legislative, not judicial, consideration) that categorizes felonies into first, second and third degrees, the implication is clear that forgery, as a crime against property, is not considered as a very serious offense. The suggested distinction between "a dangerous offender" and "an ordinary felon" clearly puts forgers with the ordinaries. If there is merit to such categorization, it is enough to say that the legislature, not the courts, ought adopt it. If the "considered judgment of all these studies" is accepted by this court as persuasive that "the ordinary offender ought not be sentenced to a term in excess of five years unless circumstances are present" etc., we have a new maximum sentence established not by the legislature, but by this court, based upon a distinction between "dangerous" and "ordinary" not established by the legislature, but recognized by this court. That makes this court not only a reviewing court as to sentences imposed by trial courts, but a super-legislature determining for itself the relative seriousness of differing crimes as well as the appropriate-

ness of sentences imposed within statutorily set maximums.

Prophecy is always a risky undertaking, but the writer has some doubts about the majority opinion's prediction that "a byproduct of a reasonable review of sentencing by an appellate court" may well be the "diminution of the appellate court's workload by reducing appeals on the merit." It may be that the convicted criminal who has neither the law nor the facts on his side will be reduced to complaining about the sentence. However, it is as likely that he will add a complaint as to the sentence to other points raised on appeal or by writ. The shotgun, not the rifle, is the model for most appeals in criminal cases.

The concurring opinion relates a reduction of sentence in this case to the matter of "great disparity [in sentences imposed] in substantially similar cases." Case-by-case adjustment downward by an appellate court is hardly an answer to so complex a problem. As the writer pointed out, concurring in *Riley v. State* (1970), 47 Wis. 2d 801, 808, 809, 177 N. W. 2d 838, the "various proposals for legislative action to promote greater uniformity in sentencing procedures . . . limit the reviewing agency created to eliminating disparate results, and authorize adjusting sentences up or down to further this goal. . . ." In any event, as stated in *Riley*, the writer believes that, under our form of government, the "discussion and decision in this area belong to the legislative branch of our government, not the judicial." If guidelines there are to be, however or by whom established, the writer would hope that they would include reserving to trial judges the right to impose a maximum sentence where a convicted defendant makes clear that he will repeat the offense or violate the laws as soon as he is given the opportunity to do so. The people are entitled to the fair and firm enforcement of criminal laws, including pro-

tection against repetition of the same offense by the same offender. The writer would affirm.