PER CURIAM.
¶1 Daetrell Jamal Watson appeals a judgment of conviction entered upon his guilty plea to one count of armed robbery as a party to a crime. He also appeals an order denying postconviction relief.[1] He contends that disparate sentences imposed on his codefendants warrant modification of the twenty-two-year term of imprisonment imposed on him. We reject his arguments and affirm.
Background
¶2 We take the facts of the offenses from the criminal complaint, which Watson admitted was true and correct when he pled guilty. Two young men with handguns approached D.T. at a gas station in Milwaukee, Wisconsin, at approximately 9:00 p.m. on November 23, 2014. As D.T. pumped gas into a Dodge Charger, the men demanded the keys to the car. D.T. complied. The men got into the Charger and pulled away from the gas pumps. A video surveillance system recorded the robbery. The recording also showed two other young men in an alley adjacent to the gas station. They joined the pair in the stolen Charger, which then drove away.
¶3 At approximately 11:50 p.m. that same night, a young black male with a handgun approached A.W. as he parked his Chevrolet Monte Carlo on a Milwaukee city street. The gunman ordered A.W. out of the car and drove away.
¶4 Early on the morning of November 24, 2014, a young black male standing near a parked car pointed a handgun at L.M. when he stopped his Ford Explorer at a stop sign. A second young black male with a handgun confronted L.M., ordered him out of the car, and struck him on the head. The assailant took L.M.'s wallet, then got in the Explorer and drove it away. L.M. observed a Dodge Charger near the scene revving its engine during the robbery.
¶5 Ten minutes after L.M. was robbed, S.K. was driving his Mercedes Benz when a Dodge Charger pulled in front of him and forced him to stop. A second car drove up next to the Mercedes. A black male with a handgun emerged from the Charger, ordered S.K. to get out of the Mercedes, and hit S.K. on the head multiple times with the gun. Four black males then got out of the cars surrounding the Mercedes and began beating S.K. After the attack, the gunman got into S.K.'s Mercedes while the other men got into the cars surrounding it, and all three cars sped away from the scene.
¶6 A police officer responding to S.K.'s report of an armed robbery observed S.K.'s Mercedes travelling at high speed on a Milwaukee roadway. The officer pursued the Mercedes, which crashed into a utility pole. Three men ran from the car and escaped capture. Police recovered a handgun located between the driver's seat and the center console.
¶7 Additional officers responded to dispatch reports of armed robbery suspects fleeing from a stolen Mercedes. These officers observed the Dodge Charger stolen from D.T. The officers pursued the Charger, which crashed into a light pole. Three men ran from the Charger and one of the men, subsequently identified as Watson, threw a handgun to the ground. Officers chased the fleeing suspects and caught Watson and his brother, Montrell Watson.[2]
¶8 Watson gave police a statement admitting his involvement in the four carjacking incidents and describing the details of the crimes. Watson's statement led police to arrest Travis Smith, and Smith's statement led to the arrest of Charles Moore. The statements also implicated and led to charges against a fourth suspect, Tyrell Tolbert.
¶9 The State charged Watson with five crimes for his role in the four carjacking incidents: four counts of armed robbery as a party to a crime and one count of possessing a firearm as a person previously adjudicated delinquent for felonious acts. The State alleged that Smith and Tolbert also participated in all four carjacking incidents and charged both men with four counts of armed robbery as a party to a crime. As for Moore, the State charged him with two counts of armed robbery as a party to a crime based on his participation in the incidents involving A.W. and S.K.[3]
¶10 Pursuant to a plea agreement, Watson pled guilty to one count of armed robbery as a party to a crime, and the remaining charges were dismissed and read in for sentencing purposes. The agreement required Watson to testify for the State if any of the codefendants went to trial. Ultimately, however, all of the codefendants resolved the charges with plea bargains, and Watson was not required to testify.
¶11 After all of the defendants pled guilty, Watson proceeded to sentencing. He faced a maximum of twenty-five years of initial confinement and fifteen years of extended supervision. See WIS. STAT. §§ 943.32(2) (2013-14),[4] 939.50(3)(c), 973.01(2)(b)3., 973.01(2)(d)2. In determining the appropriate sentence, the circuit court emphasized the goals of rehabilitation and community protection and discussed numerous factors relevant to the sentencing decision.
¶12 The circuit court found that Watson had pled guilty to a very serious offense and that the crime spree in which he participated had posed a risk of grave harm or death to the victims and the perpetrators. The circuit court observed that Watson had prior juvenile adjudications for attempted armed robbery and for robbery and that his correctional experience as a juvenile had not prevented him from committing armed robbery as an adult. The circuit court also took into account that Watson had dropped out of high school and had not obtained a high school equivalency degree during the two years he spent awaiting disposition in this matter.
¶13 In mitigation, the circuit court recognized that Watson was "a young man," nineteen years old at the time of his crimes, who had not fully matured. The circuit court also praised Watson for his "cooperation with the police and prosecutors" and for his courtroom demeanor. The circuit court found, however, that he had engaged in violent behavior and associated himself with violent people. The circuit court determined that Watson had substantial rehabilitative needs for education, vocational training, and counseling, and that he must address those needs in a confined setting. Therefore, the circuit court concluded that the appropriate sentence for Watson was ten years of initial confinement and twelve years of extended supervision.
¶14 In due course, Smith, Moore, and Tolbert also proceeded to sentencing.[5] Smith, who had pled guilty to one count of armed robbery, received an evenly bifurcated sixteen-year term of imprisonment. Moore, who had pled guilty to two counts of armed robbery, received two concurrent, evenly bifurcated sixteen-year sentences. Tolbert, who had also pled guilty to two counts of armed robbery, received two consecutive, evenly bifurcated twenty-six-month sentences. At the time of sentencing, however, he was serving an aggregate term of forty-four years of initial confinement and twenty-two years of extended supervision for a series of crimes, including first-degree reckless homicide, that he had committed while out of custody on bail for the crimes at issue in the instant case. The circuit court ordered Tolbert to serve the twenty-six-month sentences imposed in this matter consecutive to the sixty-six years of imprisonment previously imposed.
¶15 Watson filed a postconviction motion seeking sentence modification. He alleged that his sentence, although "otherwise proper," was unduly harsh in light of the disparate sentences imposed on his codefendants. The circuit court denied the motion in a written order, concluding that Watson and his codefendants were not similarly situated.
¶16 Watson appeals, renewing his claim for sentence modification. Specifically, he seeks a sentence "equivalent to that of his codefendants (with the exception of Mr. Tolbert) constituting eight years of initial confinement and eight years of extended supervision."
Discussion
¶17 As a preliminary matter, we observe that Watson does not challenge the circuit court's original exercise of sentencing discretion. He concedes that "the circuit court's sentence was fully justifiable under the dictates of State v. Gallion , 2004 WI 42, 270 Wis. 2d 535, 678 N.W.2d 197, which governs the exercise of sentencing discretion." We agree. The circuit court incontrovertibly identified appropriate sentencing goals, considered a wide range of proper sentencing factors relevant to those goals, and fashioned a lawful sentence with a rational and explainable basis. See id. , ¶¶40-45, 76. Watson's concession is thus well-advised.
¶18 Watson's challenge on appeal is to the circuit court's postconviction order denying sentence modification. Watson maintains that his sentence has proved to be unduly harsh because, he says, he is similarly situated with respect to his codefendants and is therefore entitled to a sentence that is equivalent to the sixteen-year terms that Smith and Moore received.
¶19 When a circuit court concludes in postconviction proceedings that its sentence was not unduly harsh, we review that conclusion for an erroneous exercise of discretion. See State v. Grindemann , 2002 WI App 106, ¶30, 255 Wis. 2d 632, 648 N.W.2d 507. We will not set aside a circuit court's discretionary ruling "if it appears from the record that the court applied the proper legal standard to the facts before it, and through a process of reasoning, reached a result which a reasonable judge could reach." See id. We search the entire record for reasons to sustain the sentence imposed. See McCleary v. State , 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971). Further, whether codefendants are similarly situated is a question of fact. See State v. Ralph , 156 Wis. 2d 433, 439, 456 N.W.2d 657 (Ct. App. 1990). We will sustain a circuit court's factual findings unless they are clearly erroneous. See id. Watson's burden is therefore substantial, and Watson fails to shoulder it successfully.
¶20 In determining that Watson and his codefendants were not similarly situated, the circuit court first found that Watson's history was different from the histories of all of his codefendants in a critical way: unlike them, he had previously participated in the same type of criminal activity as he engaged in here. The record plainly supports that finding. The record shows that Watson was adjudicated delinquent in 2012 after committing an attempted armed robbery during which he approached a person getting into a car and demanded the person's keys at gunpoint. Watson and the victim struggled, and Watson hit the victim in the head with the gun before fleeing the scene. Moreover, the record shows that Watson was adjudicated delinquent for a second violent incident, namely, robbery by use of force. Smith and Moore, by contrast, had only nonviolent misdemeanor convictions, and Tolbert had no criminal history at the time of the carjackings.
¶21 Second, the record supports the finding that Watson and his codefendants were not similarly situated in terms of their culpability. When police arrested the men, Watson alone possessed a gun and, although he argues that "he only grabbed the gun after the car crashed," the record shows that his brother Montrell Watson told police that he saw a gun sticking out of Watson's pants pocket earlier in the evening. Further, Watson misplaces reliance on the State's theory that the codefendants all handled a gun during the course of the crime spree. Watson, unlike the other men, was prohibited by law from possessing a firearm. See WIS. STAT. § 941.29(2)(b). Thus, the actions of his codefendants in handling a gun were not similar to his actions because, for Watson, handling a gun was itself a crime.
¶22 Third, and relatedly, the record supports the finding that Watson and his codefendants were not similarly situated in regard to the charges they faced. The State charged only Watson with possessing a firearm while prohibited from doing so. Thus, Watson faced more charges and more potential prison time as a result of the crime spree than did any of his codefendants.
¶23 Fourth, the record supports the finding that Watson and Moore were not similarly situated because Watson participated in and was charged with committing all four of the carjackings. Moore, by contrast, participated in only two of those incidents.
¶24 Last, Watson points out that two of his accomplices pled guilty to two armed robberies, while he pled guilty to only one. Watson asserts that this "cuts in his favor" and "makes [his] underlying sentence less, as opposed to more, reasonable." We disagree. "[L]eniency in one case does not transform a reasonable punishment in another case to a cruel one." Ocanas v. State , 70 Wis. 2d 179, 189, 233 N.W.2d 457 (1975) (citation omitted). Moreover, to the extent that Watson concedes that he and his codefendants were not similarly situated, his disparate sentencing claim must fail. A disparate sentencing claim rests on the theory that similarly situated defendants should receive similar sentences. See Jung v. State , 32 Wis. 2d 541, 553, 145 N.W.2d 684 (1966) ; see also Ralph , 156 Wis. 2d at 439. An allegation that differently situated defendants received dissimilar sentences falls outside the scope of the claim that Watson presents. At best, the assertion amounts to a claim that the circuit court erroneously exercised its discretion when sentencing Watson, a claim that he explicitly disavows.
¶25 In sum, the record reflects-and Watson concedes-that the circuit court properly exercised its discretion when imposing his sentence in this matter. Although the sentence the circuit court selected was not identical to the sentences imposed on any of his codefendants, Watson fails to demonstrate any error in the circuit court's finding that he and his codefendants were differently situated. He therefore fails to identify any basis for relief from the sentence he received. Accordingly, we affirm.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5. (2017-18).

The Honorable Dennis Flynn entered the judgment of conviction. The Honorable Michelle A. Havas entered the order denying postconviction relief.

We refer to the appellant as Watson and to his brother as Montrell Watson.

The State did not charge Montrell Watson or a sixth man, Deontre Smith, who was allegedly present during some of the incidents.

All references to the Wisconsin Statutes are to the 2013-14 version unless otherwise noted.

Neither Judge Flynn nor Judge Havas presided over the sentencing of Watson's codefendants.