STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Daniel J. SEPULVEDA, Defendant-Appellant.†

Supreme Court

*No. 82–1496–CR. Argued February 29, 1984.—
Decided June 27, 1984.*

(Also reported in 350 N.W.2d 96.)

† Motion for reconsideration denied by published per curiam opinion filed August 29, 1984.

For the plaintiff-respondent-petitioner the cause was argued by *David J. Becker,* assistant attorney general, with *Bronson C. La Follette,* attorney general, on the briefs.

For the defendant-appellant there was a brief and oral argument by *Mark Lukoff,* first assistant state public defender.

LOUIS J. CECI, J.   This is a review of an unpublished court of appeals decision which reversed a judgment of conviction rendered by Honorable Max Raskin, Reserve Circuit Judge, in Kenosha county circuit court.

On August 20, 1981, the defendant, Daniel J. Sepulveda, confronted a thirteen-year-old girl as she was leaving a grocery store. The defendant showed her a badge and told her that some people from the store had informed him that she had stolen an item from the store by putting it in her shirt. He then told her to remove her shirt. When the girl refused, the defendant told her that she had to get into his car. He repeated this to her several times, and, when she failed to follow his demands, he grabbed her by the wrist. The victim tried to pull away from him, and the defendant released her only when he saw a woman approaching them. He told the victim that he would follow her home and left the area.

The defendant was arrested that same day, and a criminal complaint was filed on August 24, 1981. On December 21, 1981, a jury trial was commenced in the Kenosha county circuit court, before Honorable Max Raskin, Re-

serve Circuit Judge. At the trial, the state introduced evidence of the above incident and one which had occurred two days prior to it, on August 18, 1981. On that date, the defendant had approached a ten-year-old girl at the same grocery store. After showing her a badge and telling her that he was a police officer, he accused her of stealing and offered to drive her home. She refused and walked home.

On December 23, 1981, the jury returned a verdict, finding the defendant guilty of abduction, contrary to sec. 940.32(3), Stats., and personating a peace officer, contrary to sec. 946.70. The sentencing hearing · was conducted on December 30, 1981. As part of the disposition of the case, the parties agreed to read in two counts of lewd and lascivious behavior, in violation of sec. 944.20 (2), arising from two incidents on July 7, 1981, and August 19, 1981, in which the defendant had exposed himself.

The state recommended that the defendant be imprisoned. The defendant's attorney, on the other hand, recommended that the defendant be placed on probation and allowed to continue outpatient treatment with his psychologist, Dr. Richard Fogle. Dr. Fogle testified that the defendant's behavior could effectively be controlled by virtue of this therapy. The probation agent who had prepared the presentence report, Mark Colby, recommended that the defendant be placed on probation with the condition that he voluntarily admit himself to the Mendota Mental Health Institute for intensive inpatient therapy.

At the conclusion of the sentencing hearing, the trial judge sentenced the defendant to thirty days in the county jail for the charge of personating a peace officer. He stayed this sentence and placed the defendant on probation for one year. Concerning the abduction charge, the judge sentenced the defendant to a term not to

exceed six years at the Green Bay Correctional Institution. He also stayed this sentence and placed the defendant on probation for three years, with certain conditions. The first of these conditions was that the defendant voluntarily admit himself to the Mendota institute "for the intensive care and treatment that the Court feels that he must have in order to live a peaceful and nonviolative life in this community." A further condition concerned the requirement that the court be notified of the defendant's release from Mendota. The final condition addressed the remaining period of probation and provided for the defendant's continued therapy on an outpatient basis and the court's notification should the defendant no longer need such treatment. Additionally, the defendant was to abide by all rules and regulations of the probation department while he was still on probation following his release from Mendota.

On January 14, 1982, the defendant was interviewed by psychiatrist James Richard Thiel of the Mendota institute. Based upon this interview, the defendant was denied admission to the institution. Dr. Thiel concluded that the defendant suffered from a personality disorder, or antisocial personality, and, in the doctor's opinion, psychotherapy has had "very little if any success" in treating such disorders.

Subsequently, the probation department attempted to revoke the defendant's probation. However, at the revocation hearing no probable cause was found to revoke the defendant's probation, and the proceedings were dismissed.

On February 4, 1982, the state filed a motion for reconsideration of the sentence imposed by the court on December 30, 1981. A hearing was conducted on February 11, 1982, during which Dr. Thiel testified as to the reasons why the defendant was denied admission to the mental health institute.

At the conclusion of the hearing, the trial judge set aside the previous sentence and imposed the following sentence: That the defendant be confined at the Green Bay state reformatory for an undetermined period of not more than three years on the abduction charge and that the defendant be confined for thirty days on the charge of personating a peace officer, to run concurrently with the three-year sentence. The judge reasoned that the defendant's denial of any responsibility for his actions, which led to his rejection from admission to Mendota, was a "new factor" which necessitated the vacation of the previous sentence and the imposition of a new one. The court referred to the definition of "new factor" as set forth in *Rosado v. State,* 70 Wis. 2d 280, 234 N.W.2d 69 (1975).[1]

The defendant subsequently moved the court to vacate the February 11, 1982, sentence, alleging that there was no statutory authority for the state to have requested the defendant's resentencing and that the court's action had violated the double jeopardy clauses of the Wisconsin and United States Constitutions. The court denied the defendant's motion and, on August 6, 1982, issued a written decision adhering to its former view that the defendant's nonacceptance at Mendota constituted " 'identifiable factual data not known to the trial judge at the time of the original sentencing proceedings,' " citing *North Carolina v. Pearce,* 395 U.S. 711, 751 (1969) (White, J., concurring). The trial judge also relied on language found in the case of *State v. Dean,* 102 Wis. 2d 300, 306 N.W.2d 286 (Ct. App. 1981) [Dean I], which was subsequently

[1] The *Rosado* decision utilized the following language to define "new factor": "[A] fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties." *Id.* at 288.

withdrawn in the later appeal of *State v. Dean,* 111 Wis. 2d 361, 365, 330 N.W.2d 630 (Ct. App. 1983) [Dean II].[2]

On August 6, 1982, the defendant appealed his second amended judgment of conviction to the court of appeals. In a brief, unpublished opinion, the court of appeals reversed and remanded the cause to the circuit court with directions. The court concluded that the case fit squarely within the holding of *Dean II* and that Sepulveda's resentencing after being placed on probation violated his constitutional rights. The trial court was directed to reimpose the original sentence, and modification of probation conditions through the proper administrative procedures was ordered.

The state subsequently petitioned this court for review, and we granted the petition.

On review, then, we are faced with the following two issues: (1) Did the trial court have the authority to modify the defendant's probation from institutionalization in a mental hospital to incarceration in a state prison; and (2) when a trial court grants probation as the form of disposition in a criminal case and imposes

---

[2] The language relied on by the trial court from *Dean I* was as follows: "Should alternative probationary conditions prove unavailable, sentence may be reimposed without placing the defendant in double jeopardy . . . ." 102 Wis. 2d at 304 (footnote omitted). In *Dean II,* the court of appeals stated the following: "We note that the trial court reimposed sentence on Dean because in dicta to *Dean I* we stated that this would not place the defendant in double jeopardy. The dicta in *Dean I* was error and the trial court was misled by this error. We now hold that this sentence does violate the double jeopardy prohibitions because our supreme court has stated, 'once it [probation] has been granted this conditional liberty can be forfeited only by breaching the conditions of probation.' We conclude that our former statement in *Dean I* was wrong. Accordingly, we hold that the trial court erred in reimposing sentence on Dean." 111 Wis. 2d at 365–66. (Footnotes omitted.)

the condition that the defendant must voluntarily admit himself to a mental health institution for intensive treatment, does modification of the order of probation to include imprisonment when the defendant is denied admission to the institution violate double jeopardy?

We note that for purposes of this review, the state has conceded that the original imposition of probation constituted a form of punishment.

## I.

## DID THE TRIAL COURT HAVE THE AUTHORITY TO MODIFY THE DEFENDANT'S PROBATION FROM INSTITUTIONALIZATION TO INCARCERATION?

The defendant argues that the trial court did not have the authority to modify or set aside the defendant's probation in such a manner as to change the terms from institutionalization to incarceration. As support, the defendant directs our attention to sec. 973.09 (1) (a) and (3) (a) and sec. 973.10 (2), Stats. The relevant portions of those statutes read as follows:

"**973.09 Probation.**   (1) (a) Except as provided in par. (c) or if probation is prohibited for a particular offense by statute, if a person is convicted of a crime, the court, by order, may withhold sentence or impose sentence under s. 973.15 and stay its execution, and in either case place the person on probation to the department for a stated period, stating in the order the reasons therefor. The court may impose any conditions which appear to be reasonable and appropriate. The period of probation may be made consecutive to a sentence on a different charge, whether imposed at the same time or previously.

"   . . .

"(3) (a) Prior to the expiration of any probation period, the court, for cause and by order, may extend

probation for a stated period or modify the terms and conditions thereof."

"**973.10 Control and supervision of probationers.** . . .
"(2) If a probationer violates the conditions of probation, the department may:
"(a) If the probationer has not already been sentenced, order the probationer brought before the court for sentence which shall then be imposed without further stay under s. 973.15; or
"(b) If the probationer has already been sentenced, order the probationer to prison, and the term of the sentence shall begin on the date the probationer enters the prison."

Therefore, the defendant maintains that once the trial court imposes probation and transfers custody of the defendant to the department, it retains only the authority to *modify* the defendant's probation, while the department of health and social services must be the party to revoke the defendant's probation. The defendant argues that the judge's modification to include incarceration essentially amounted to a revocation, which exceeds the court's authority under sec. 973.09. The court of appeals accepted this argument, utilizing the following language in its opinion:

"Modification of probation conditions must be addressed through the proper administrative processes and not in the manner here attempted by the state."

We begin our discussion with the observation that the court's sentencing power is derived solely from the statutes and that the courts must adhere to statutory limits when fashioning sentences.[3] The defendant has not

---

[3] *Grobarchik v. State*, 102 Wis. 2d 461, 467, 307 N.W.2d 170 (1981). In *Grobarchik*, this court stated that under the doctrine of separation of powers, it is for the legislature to prescribe the punishment for a particular crime and for the courts to impose that punishment. "The fashioning of a criminal disposition is not an exercise of broad, inherent court powers. . . . If the authority

argued that the original condition of probation, namely, institutionalization at Mendota, was unreasonable. Rather, he has argued that when he was unable to gain admission to Mendota, the trial court did not have the authority to incarcerate him.

In *Huggett v. State,* 83 Wis. 2d 790, 266 N.W.2d 403 (1978), this court discussed the probation statute, particularly sec. 973.09(3)(a) addressing the court's power to extend probation or to modify its terms. *Huggett* involved the trial court's extension of the defendant's probation for failure to make the court-ordered restitution. The court initially noted that,

"The dual goals of probation are 'the rehabilitation of those convicted of crime and the protection of the state and community interest.'" *State v. Tarrell,* 74 Wis. 2d 647, 653, 247 N.W.2d 696 (1976). *Id.* at 798.

Concerning the court's extension of the defendant's probation, the court stated,

"Failure to make restitution within the original probation period might constitute cause for extending probation and continuing restitution *if there is a basis for believing that additional restitution would effectuate the objectives of probation . . . ." Id.* at 803 (Emphasis added.)

This court recognized in *Huggett* that inherent within the probation statute is the court's continued power to effectuate the dual purposes of probation, namely, rehabilitating the defendant and protecting society, through the court's authority to modify or extend probationary terms.

In the instant case, Judge Raskin utilized the following language when he placed the defendant on probation:

---

to fashion a particular criminal disposition exists, it must derive from the statutes." *Id.* at 467. (Citations omitted.)

"The Court will stay that sentence and place the defendant on probation for a period of three years with certain conditions. With respect to those conditions, the Court adopts the recommendations made by the probation officer in his report . . . which means that the defendant shall voluntarily admit himself to the Mendota Institution for the *intensive care and treatment that the Court feels that he must have in order to live a peaceful and nonviolative life in this community.* (Emphasis added.)

The court's language obviously indicates that the judge had determined that confinement in a structured setting was necessary for the rehabilitation of the defendant, as well as for the protection of society. It is equally obvious that the court specifically rejected outpatient therapy for the defendant, as had been recommended by the defendant's psychologist. The structured setting that was chosen by the court was the Mendota institute. This is an appropriate condition under sec. 3.2 of the American Bar Association's *Standards Relating to Probation* (Approved Draft 1970), as adopted by this court.[4]

We believe that what occurred in the instant case, through the defendant's inability to gain admission to Mendota, completely circumvented the intent behind the judge's grant of probation. In essence, a failure of a primary condition, namely, confinement, became impossible because of the nature of the defendant's mental condition which was unknown to the judge at the time of sentencing. As we noted above, the judge's grant of probation was based upon the primary condition of complete confinement and specifically rejected outpatient therapy. This grant was fashioned with the purpose of rehabilitating the defendant, yet protecting society by

---

[4] Sec. 3.2, entitled "Nature and determination of conditions," provides in part: "(c) Conditions may appropriately deal with matters such as the following: . . . (v) undergoing available medical or psychiatric treatment; (vi) maintaining residence in a prescribed area . . . ."

isolating the defendant during the rehabilitation process.

We noted above that inherent within the probation statute is the judge's authority to effectuate the purposes behind probation. *Huggett v. State,* 83 Wis. 2d at 803. In this case, because of the fact that the grant of probation was premised upon confinement, we hold that the trial judge possessed the authority to modify probation to include incarceration when this primary condition becomes unachievable, thereby circumventing the intent behind the grant of probation.[5]

---

[5] This is not a situation such as occurred in *Scales v. State,* 64 Wis. 2d 485, 497, 219 N.W.2d 286 (1974). In *Scales,* this court held that a defendant's refusal to acknowledge his guilt was an impermissible reason for imposing incarceration rather than probation. The record in the instant case reveals that Dr. Thiel based his decision to deny the defendant admission to Mendota on the grounds that during his interview with the defendant, the defendant denied any culpability for any of his past conduct. For example, Dr. Thiel's testimony reveals that during his interview with Sepulveda, the defendant explained that he had come to Mendota as a result of convictions for two offenses, and he characterized these offenses as some of his "practical jokes." He felt that he need not have gone through all the recent procedures at all, but that persons had lied about him. Dr. Thiel testified that this refusal on the defendant's part to accept responsibility for his actions would essentially cause any psychiatric treatment utilized to be futile.

However, it was not upon the defendant's refusal to acknowledge guilt that the judge based his actions. Rather, he based his decision to incarcerate the defendant through modification of probation upon the failure of the primary condition of the grant of probation, namely, the confinement of the defendant through institutionalization. Therefore, we find this case to be distinguishable from *Scales,* and the fact that the defendant denied culpability is of little relevance.

There is also some dispute in the record as to whether the defendant could, in effect, accept responsibility for his actions, even though the defendant stated the following to the judge when asked if he had anything to say at the conclusion of the sentencing hearing: "Yes, your Honor. I would like to just say that I know

We hold that this modification is *not* a revocation. It is instead a very limited extension of the power to modify the terms of probation and should only be utilized by the courts in cases such as the instant one, where the judge's intent behind the grant of probation is completely frustrated due to the failure of a primary condition. An analogy to the court's authority to exercise this power to modify may be found in the Wisconsin cases addressing resentencing following a new trial or postconviction remedy due to the judge's knowledge of a new factor. For example, in *State v. Leonard,* 39 Wis. 2d 461, 159 N.W.2d 577 (1968), the defendant successfully vacated a sentence imposed by the court following revocation of probation because the defendant had not been afforded his constitutional right to counsel at the sentencing. *Id.* at 464. Upon resentencing, the court increased the vacated sentence by three years. Although this court remanded the case for resentencing in accordance with the standard adopted in the opinion, the opinion set forth the following standard:

"Hereafter, on resentencing following a second conviction after retrial, or mere resentencing, the trial court shall be barred from imposing an increased sentence un-

that I had problems then. They're not serious problems . . . ." Dr. Thiel testified that patients who seek psychiatric help may often be reluctant to admit their problems. He also testified that some patients never admit to their need for psychiatric treatment. However, later in the record, the doctor testified as follows regarding his evaluation of the defendant: "That it was my clinical opinion that he had a characterological disorder, that what would be available to him as an inpatient in psychiatric services would not be of benefit to him, that *it was also my opinion that he be liable for consequences of behavior.*" (Emphasis added.) However, as stated above, we believe that whether or not the defendant could accept responsibility for his actions is irrelevant, since the judge did not choose to incarcerate him based upon this denial, but rather upon the fact that he was unable to be confined at Mendota.

less (1) events occur or come to the sentencing court's attention subsequent to the first imposition of sentence which warrant an increased penalty; and (2) the court affirmatively states its grounds in the record for increasing the sentence." *Id.* at 473.

Subsequently, in *Denny v. State,* 47 Wis. 2d 541, 178 N.W.2d 38 (1970), this court reiterated the *Leonard* standard. The *Denny* opinion also noted that the United States Supreme Court had reached a decision similar to *Leonard* in *North Carolina v. Pearce,* 395 U.S. 711, and this court quoted the following language from *Pearce* in its discussion of new factors:

"'A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." *Williams v. New York,* 337 U.S. 241, 245.'" *Denny v. State,* 47 Wis. 2d at 545, citing *North Carolina v. Pearce,* 395 U.S. at 723.

Although the *Denny* opinion acknowledged that new factors may involve more generalized factors than those found in the definition set out in *Pearce,* such as "any objective, identifiable factual data not known to the trial judge at the time of the original sentencing proceeding,"[6] we find that events which transpired in the instant case fit squarely within the above rationale. Events following the grant of probation, namely, the defendant's denial of admission to Mendota, shed light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." In particular, the testimony of Dr. Thiel from Mendota revealed to Judge Raskin that the defendant suffered from a personality disorder which was, for all

---

[6] *North Carolina v. Pearce,* 395 U.S. at 751 (White, J., concurring).

practical purposes, untreatable. This untreatable personality disorder is comparable to the "new factor" or "objective, identifiable factual data" unknown to the trial judge at the time of the defendant's original sentencing. Stated another way, the nature of the defendant's disorder constituted,

" 'a fact or set of facts highly relevant to the imposition of sentence, *but not known to the trial judge at the time of original sentencing,* either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.' " *State v. Hegwood,* 113 Wis. 2d 544, 546, 335 N.W.2d 399 (1983) (emphasis added), citing *Rosado v. State,* 70 Wis. 2d at 288.

As we noted earlier in our analysis, the trial judge apparently strove to fashion a disposition which would rehabilitate the defendant through treatment, yet protect society from any further actions by the defendant. This was based partially upon Dr. Fogle's testimony that the defendant had cooperated in his treatment, had admitted to having sexual problems, and appeared to be benefiting from the therapy. However, at the February 11, 1982, hearing, Dr. Thiel testified that the defendant denied any responsibility for the offenses for which he had been convicted. The doctor's testimony indicates that the defendant boasted of his sexual prowess and, when asked about the concept of controlling his own sexual impulses, he made remarks that the doctor considered to show "bravado."

We further observe that the doctor testified that the defendant suffered from a "personality disorder" or "characterological defect," which he described as follows:

"That is a characterological defect, where a person does not have internal control upon his beliefs and actions and feels not responsible for negative kinds of things that should happen to him."

Dr. Thiel further testified that he has attempted to treat patients with personality disorders in the past and has had no success with such treatment. As we noted above, the doctor stated that such disorders are of a type which psychotherapy has little, if any, success in treating. He attributed this failure to psychotherapy to the "dynamics" of the disorder.

"The individual does not except [sic] responsibility for his or her position enough to have success in dealing within the realm of psychiatry and psychotherapy with a person, the person needs to be a participant in the process, has to recognize that he or she has difficulty." .

The doctor testified that neither inpatient nor outpatient therapy offers much benefit in treating such disorders. When asked to make an assumption regarding the treatment available at institutions other than Mendota, the doctor testified that he could not make the assumption that a person suffering from such a disorder is "treatable." Upon further questioning regarding the effects of working with the defendant in a nonsecure setting, Dr. Thiel stated the following:

"It is impossible for me to predict people's behaviors. Given the past history of this particular individual and given that the best predictor of future behavior is past behavior, there is an increased chance that this individual's future behavior would be similar to his past behavior should there not be some constraints placed upon him."

The untreatable nature of the defendant's personality disorder is clearly similar to a "new factor" in resentencing and justifies the inclusion of incarceration in the court's power to modify the terms of probation under sec. 973.09 (3) (a), Stats. This "new factor" entirely frustrated the judge's intent and circumvented the dual

purposes of probation—to rehabilitate the defendant, yet protect society. It is obvious that the trial court fashioned its disposition based upon Dr. Fogle's testimony that the defendant was cooperating in his therapy sessions and accepting responsibility for his actions, particularly those involving the August 20, 1981, incident. A judge is not a psychologist or psychiatrist and necessarily may rely upon the opinions of such experts concerning what disposition would be most beneficial to the particular defendant. However, in this case the court's subsequent knowledge or realization of the untreatable nature of the defendant's disorder, coupled with the defendant's attitude indicating bravado for his own sexual prowess and impulsiveness, together with the increased chance that his future behavior would repeat past behavior, clearly represents a new factor. We find that this new factor justified the court's modification of the terms of probation to include incarceration of the defendant.

This court has stated that whether a new factor warrants modification of a sentence is a question of discretion. *State v. Hegwood,* 113 Wis. 2d at 546.

"Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards." *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971).

Keeping the above concerns in mind, we believe that the same argument may be applied to the instant case concerning the modification of probation. The record indicates that the trial judge properly exercised his discretion by choosing to modify the terms of probation to include incarceration. The trial court gave his reasons as follows:

"At the time that the Court imposed sentence of the conditional probation, neither the prosecution nor the defense nor the Court were [sic] apprised of the possibility that the defendant would not be accepted as a patient at Mendota. It did not cross the mind of any the parties, least of all the Court that the defendant, by his attitude that he'd ever need such treatment or was guilty of any wrong doing, could impede his acceptance as a patient and thereby frustrate the entire process of probation."

Based upon the fact that the defendant had proved to be "untreatable," a structured prison setting offered the only viable alternative available to the judge to ensure the protection of society by providing the necessary constraints upon the defendant's impulses.

Because we have concluded that the judge exercised the proper discretion and authority by modifying the grant of probation to include incarceration, we must now address the issue of whether or not this action violates the double jeopardy provisions of the Wisconsin and Federal Constitutions.

## II.

WHEN A TRIAL COURT GRANTS PROBATION AS THE FORM OF DISPOSITION IN A CRIMINAL CASE AND IMPOSES THE CONDITION THAT THE DEFENDANT MUST VOLUNTARILY ADMIT HIMSELF TO A MENTAL HEALTH INSTITUTION FOR INTENSIVE TREATMENT, DOES MODIFICATION OF THE ORDER OF PROBATION TO INCLUDE IMPRISONMENT WHEN THE DEFENDANT IS DENIED ADMISSION TO THE INSTITUTION VIOLATE DOUBLE JEOPARDY?

Article I, sec. 8(1) of the Wisconsin Constitution provides that "no person for the same offense may be put

twice in jeopardy of punishment . . . ."[7]  In the case of *State v. Rabe,* 96 Wis. 2d 48, 291 N.W.2d 809 (1980), this court noted that because of the similarity of the language between this provision and that used in the United States Constitution, this court "has accepted, where applicable, decisions of the United States Supreme Court as governing the double jeopardy provisions of both constitutions." *Id.* at 61, n. 7.  Therefore, consistent with this reasoning, we must turn our attention to the recent Supreme Court case of *United States v. DiFrancesco,* 449 U.S. 117 (1980), in order to determine its applicability to the case at hand.

The issue in *DiFrancesco* was whether 18 U.S.C. sec. 3576, authorizing the United States to appeal sentences imposed under 18 U.S.C. sec. 3575, involving special offenders, violated the double jeopardy clause of the fifth amendment of the Constitution.  Although we will not attempt to reiterate the Court's entire analysis, we will briefly set forth what we believe to be the principles which are relevant to our analysis.  In *DiFrancesco,* the Court began its analysis by summarizing the interests protected by the double jeopardy clause:

" 'It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense.' " *Id.* at 129, citing *North Carolina v. Pearce,* 395 U.S. at 717. *See also, State v. Bohacheff,* 114 Wis. 2d 402, 407, 338 N.W.2d 466 (1983) ; *State v. Gordon,* 111 Wis. 2d 133, 141, 330 N.W.2d 564 (1983) ; and *State v. Rabe,* 96 Wis. 2d at 64.

---

[7] "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. Constitution, Amendment V.

The Court then addressed the issue of whether a criminal sentence, once *pronounced*, is to be treated with the same constitutional finality as an acquittal by way of a jury verdict and concluded that because of the fundamental distinctions between a sentence and an acquittal, the double jeopardy clause does not bar the review of a sentence. *DiFrancesco*, 449 U.S. at 132. This was based upon the reasoning that the basic framework of the double jeopardy provision is to prevent the government, with its awesome power and resources, from making repeated attempts to convict a defendant for an alleged crime, "with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent." *Id.* at 136. *See, Green v. United States*, 355 U.S. 184, 187–88 (1957). The Court noted that a review of a sentence does not involve an adversary proceeding resembling a trial on the question of guilt or innocence, but is based upon a review of the sentencing court's record gathered from non-adversarial, informational pre-sentence reports. *DiFrancesco*, 449 U.S. at 136–37. Furthermore, the Court noted that because the defendant is charged with knowledge of the statute, he has no "expectation of finality in his sentence until the appeal is concluded or the time to appeal has expired." *Id.* at 136.

The second part of the Court's analysis concerned whether or not the increase of a sentence upon review under the statute constitutes multiple punishment, contrary to the double jeopardy provision. The Court noted that in the case of *United States v. Benz*, 282 U.S. 304, 307 (1931), it had set forth dictum to the effect that the federal practice of prohibiting an increase in sentence by the trial court after the defendant has begun serving the sentence is based upon the Constitution. The Court noted that the dictum's source was *Ex parte Lange*, 85

U.S. (18 Wall.) 163, 167 (1873), and that *Ex parte Lange* merely stands for the premise that a defendant cannot receive a greater sentence than the legislature has authorized.

In this case, we are faced with an area which the *DiFrancesco* Court did not address: Does a double jeopardy violation occur when a grant of *probation,* rather than a sentence, is modified to include incarceration? We are faced with applying the double jeopardy clause to a situation essentially unexplored by this court. As we noted in a recent decision,

"Although the federal constitutional guarantee against double jeopardy has 'its roots in antiquity,' it is 'one of the least understood . . . provisions of the Bill of Rights.'" *State v. Bohacheff,* 114 Wis. 2d at 406. (Citation omitted.)

The United States Supreme Court in *DiFrancesco* echoed similar concerns:

"That [the clause's] application has not proved to be facile or routine is demonstrated by acknowledged changes in direction or in emphasis." *United States v. DiFrancesco,* 449 U.S. at 127.

The language of the *DiFrancesco* case is general, and the Court in its analysis of the clause did not confine itself only to the ramifications of the statute allowing the state to appeal a special offender sentence. Rather, the Court addressed numerous situations where the double jeopardy clause is not violated, such as second trials where the defendant has terminated a trial prior to the jury's verdict, *United States v. Wilson,* 420 U.S. 332 (1975), and resentencing following a reconviction, *North Carolina v. Pearce,* 395 U.S. 711. Consequently, we believe that the principles set forth in *DiFrancesco* should govern our analysis of this case, even though we are dealing with a modification of probation.

In particular, the Supreme Court noted that the double jeopardy focus is not upon the appeal, but on the *relief requested*. *United States v. DiFrancesco,* 449 U.S. at 132. The Court concluded that,

"The double jeopardy considerations that bar reprosecution after an acquittal do not prohibit review of a sentence." *Id.* at 136.

When we focus upon the relief requested in the instant case, it is that the judge's original grant of probation be allowed to stand in spite of the total circumvention of its purpose due to the failure of its primary accompanying condition. As in the *DiFrancesco* case, we are asked to afford the judge's original grant of probation the finality of an acquittal. We refuse to do so.[8] The *DiFrancesco* Court found the difference between the imposition of a new sentence after retrial and a statute allowing the state to seek review of a sentence to be a mere "conceptual nicety." *Id.* at 136, citing *North Carolina v. Pearce,* 395 U.S. at 722. Similarly, we find the difference between a statute allowing the state to appeal a sentence, as in *DiFrancesco,* and modification following a failure of a condition of probation and the ensuing frustration of its purposes to be a mere conceptual nicety. Neither occurs as the result of any action by the defendant. It is also clear that the modification procedure in the instant case did not involve an adversary proceeding of any sort on the underlying question of guilt or innocence, but was based upon an informational type of process. The modification did not subject the defendant to "embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent"

---

[8] *See, State v. Pierce,* 117 Wis. 2d 83, 87, 342 N.W.2d 776 (Ct. App. 1983), where the court of appeals stated that the double jeopardy clause does not guarantee the finality of sentences.

through the state's repeated attempts to obtain a conviction. *DiFrancesco,* 449 U.S. at 136. Additionally, incarcerating the defendant did not result in a greater sentence than the legislature has authorized for the offenses for which the defendant was convicted. Therefore, neither of the basic guarantees of the double jeopardy clause, namely, those of protecting against multiple trials and multiple punishments, was undermined. *Id.* at 139. Accordingly, we hold that the incarceration of the defendant in the instant case is not violative of the double jeopardy clauses.[9]

We find further support for our decision in the Court's discussion of the defendant's "legitimate expectations" in *DiFrancesco. Id.* at 137. We conclude that in the instant

---

[9] The defendant directs our attention to the recent eleventh circuit case of *United States v. Jones,* 722 F.2d 632 (11th Cir. 1983). In *Jones,* the defendant was convicted of converting pledged property in violation of 15 U.S.C. sec. 714m(c), sentenced to four years' imprisonment, with all but an indeterminate six months suspended, and five years' probation was imposed. Subsequently, the district court realized that the defendant could not make restitution to the government, which had been the court's primary concern in fashioning its disposition, because of the court's mistaken impression as to the extent of the financial transactions in which the defendant had engaged. He subsequently resentenced the defendant to a straight four-year term.

The *Jones* court concluded that the defendant's legitimate expectations were frustrated by resentencing. *Id.* at 638. However, we note that the *Jones* decision did not address the issue of whether a defendant's expectations are frustrated by resentencing resulting from a defendant's unintentional misrepresentation of his affairs. *Id.* at 639, n. 6.

In the instant case, although it is not alleged that the defendant unintentionally misrepresented his willingness to accept responsibility for his conduct and thus be admitted to Mendota for treatment, we find that the testimony of Dr. Fogle may have unintentionally led the trial judge to receive a more optimistic view of the defendant's disorder than was realistic. Consequently, we believe that this case fits squarely within that issue which the *Jones* court chose not to address.

case, Sepulveda's legitimate expectations were not defeated by the court's modification of probation to include incarceration. As the *DiFrancesco* opinion noted, the defendant is charged with knowledge of the government's right to appeal his sentence under 18 U.S.C. sec. 3576. Similarly, Sepulveda was aware that the trial court *specifically rejected outpatient therapy* and instead imposed probation, premised upon total confinement, with the primary condition that the defendant admit himself to Mendota. Therefore, the defendant was aware that he was to be confined to a structured environment where the necessary constraints could be placed upon him. As a result of this awareness, we conclude that the defendant's legitimate expectations were not defeated by subsequent incarceration. The record reveals that Dr. Thiel testified that the defendant told him that if he gained admission to Mendota, he would not have to go to prison. This bears out the fact that the defendant fully expected to be confined to some sort of structured environment.

We also conclude that the defendant's inability to gain admission to Mendota should not serve as an opportunity for him to remain on probation without any sort of constraints on his behavior, particularly on his sexual impulses. This was obviously a great concern to the trial judge, since the defendant's victim in the instant case was a child. Also, the means by which the defendant chose to perpetrate his crime, that of posing as a police officer, makes other potential child victims particularly vulnerable, since many parents teach their children to respect and trust police officers.

In summary, then, we hold that the court possessed the authority to modify the grant of probation from institutionalization to incarceration, due to the failure of the primary condition of the grant of probation and the ensuing frustration of the judge's intent. Also, we hold that this modification is not violative of the defendant's double jeopardy rights.

*By the Court.*—The decision of the court of appeals is reversed; the judgment of the circuit court is affirmed.

DAY, J. (concurring). I concur in the majority opinion and write solely for the purpose of expressing my opinion that the penalty for personating a police officer is woefully inadequate. In this case the defendant used a phony badge to "prove" to the victim that he was in fact a police officer. It is fortunate that she refused to accompany him.

One need only note the frequency with which the press reports crimes by persons claiming to their victims that they are police officers. Many sexual offenders use this method to coerce victims into automobiles.

Law abiding citizens are especially prone to follow directives from one they believe to be an officer of the law.

The crime of personating a peace officer is defined in sec. 946.70, Stats. It is classified as a Class B misdemeanor which carries a penalty under sec. 939.51(3)(b), of "a fine not to exceed $1,000. or imprisonment not to exceed thirty days or both."

The potential for harm which this offense presents should in my opinion be amended to be defined as one of the more serious felonies.

I am authorized to state that JUSTICE WILLIAM G. CALLOW joins in this concurring opinion.

SHIRLEY S. ABRAHAMSON, J. (concurring). This case presents a very unusual fact situation. Under the circumstances of this case, the majority opinion concludes that the circuit could "modify" probation to imprisonment.

The primary condition of probation in this case was the defendant's admission to the Mendota Mental Health Institute. Indeed I view the circuit court's order in this case as, in effect, being conditioned on the defendant's admission to the Institute. Since it was impossible for this

condition to be satisfied, the imposition of probation was really a nullity and the circuit court could impose sentence without violating the defendant's constitutional rights.